JACKSONVILLE SHIPYARDS, INC.,
Charleston Division, a South Car-
olina Corporation, Plaintiff,

v.

A VESSEL HONG KONG CLIPPER of
Orient Overseas Lines, her engines,
boilers, tackle, etc., and Overseas Mari-
time Co., Inc., a Corporation, Defend-
ants.

OVERSEAS MARITIME CO., Inc., Claim-
ant and Third Party Plaintiff,

v.

LATEX CONSTRUCTION COMPANY,
Third Party Defendant.

LATEX CONSTRUCTION COMPANY, as
Owner of the Dredge "NATCHEZ"

v.

Arthur J. JENKINS, Third Party
Defendant.

OVERSEAS MARITIME CO., Inc., Claim-
ant and Third Party Plaintiff,

v.

Arthur J. JENKINS, Third Party
Defendant.

Civ. A. No. 66-579.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 27, 1970.

B. Allston Moore, Jr., Moore, Mouzon & McGee, Charleston, S. C., for the Hong Kong Clipper and Overseas Maritime Co.

A. T. Smythe, Buist, Buist, Smythe & Smythe, Charleston, S. C., Donald M. Waesche, Jr., Bigham, Englar, Jones & Houston, New York City, for Latex Construction Co.

D. A. Brockinton, Jr., Brockinton & Brockinton, Charleston, S. C., and Edward R. Downing, Miami, Fla., for Arthur J. Jenkins.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

DONALD RUSSELL, District Judge.

At 0840 hours on the morning of Sunday, August 7, 1966, the steamship HONG KONG CLIPPER struck and sank a floating drydock which was permanently moored on the western bank of the Cooper River, in the Harbor of Charleston, South Carolina, doing considerable damage to the drydock, an adjacent pier and a United States Navy tugboat in the drydock.

Jacksonville Shipyards, Inc., Charleston Division, the owner of the drydock, promptly commenced an action In Admiralty against the vessel, in rem, and Overseas Maritime Company, Inc., her owners, to recover damages to its drydock. Overseas Maritime Company claimed the vessel and answered the Complaint, denying that the collision was due to the negligent navigation of the HONG KONG CLIPPER, and alleging that the dredge NATCHEZ, owned by Latex Construction Company, was improperly moored in the navigable channel and that the collision and resulting damage were due solely to the fault and negligence of Latex Construction Company in causing and permitting its dredge to obstruct the channel. Thereafter, Overseas Maritime Company impleaded Latex Construction Company as a third party defendant, demanding that such third party defendant be held liable for all damages. Latex answered both Complaints, and denied that the position of the Dredge NATCHEZ caused or contributed to the collision.

In due course, the three parties agreed upon the extent of the damages incurred by the Plaintiff, and the sum of $255,000 was paid to Jacksonville Shipyards by Overseas Maritime and Latex, who took an assignment of the Plaintiff's claim. Thereafter, in July, 1967, Latex impleaded Arthur J. Jenkins as a Third Party Defendant, and alleged that Jenkins, as the pilot of the SS HONG KONG CLIPPER, was negligent in his handling of the vessel and prayed that the Court hold Captain Jenkins responsible for the full amount of the damages sustained by the Plaintiff, or, alternatively, that Latex have a right of contribution over against Jenkins. Overseas Maritime then brought a Cross-Complaint against Jenkins, in which it alleged that he was in entire command of the vessel and that if the Court found that the vessel was responsible for the collision, it should award the shipowner judgment over against Jenkins in the same amount found against the shipowner. In his responsive pleadings, Jenkins denied that he was in any manner negligent, and alleged that the collision was due to the negligence of either Latex or Overseas Maritime, or both.

With the issues thus joined, the case was tried before me in Charleston, South Carolina, commencing May 12, 1969. A number of witnesses testified

in person, there was considerable deposition testimony from the officers of the HONG KONG CLIPPER, and there were entered into evidence numerous photographs, charts, plats and other documents. I have been furnished with Proposed Findings of Fact and Conclusions of Law by counsel representing the three remaining parties. I make the following Findings of Fact and Conclusions of Law in compliance with Rule 52 of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

1. The scene of the collision was that section of the Cooper River, on the East side of the Charleston peninsular, known and designated as Custom House Reach, at a point where such connects with Town Creek Lower Reach. Custom House Reach is a body of water lying between the Charleston peninsular on the West and the Southern end of Hog Island on the East. To its North is Drum Island, which splits the Cooper River into two channels: (1) Town Creek Lower Reach and Town Creek Upper Reach between the peninsular and Drum Island itself; and (2) Hog Island Reach and Drum Island Reach to the East of Drum Island. Town Creek Lower Reach and Hog Island Reach enter Custom House Reach from the North, being separated by a shoaly area immediately South of Drum Island. Accordingly, inbound vessels as they proceed through Custom House Reach may go either right to the east of Drum Island up Hog Island Reach or left to the west of Drum Island into Town Creek Lower Reach.

2. The United States Coast and Geodetic Survey Chart No. 470 of Charleston Harbor, in effect on August 6 and 7, 1966, to which all parties referred, shows the width of the channels and depths of the water in all the areas involved in this action.

3. The Jacksonville Shipyard facility is on the West bank of the Cooper River, adjacent to the Northwest sector of Custom House Reach, at approximately the point where Custom House Reach connects with the southern end of Town Creek Lower Reach. It includes a connected, five-section drydock. The sections of the drydock are permanently moored between two piers. When the fifth section of this drydock was added several years ago, a permit was obtained from the United States Army Corps of Engineers, after due notice, to have the fifth section extend into the navigable portion of the waterway, beyond the pier head, for a distance not to exceed 90 feet. At the time of the collision, the drydock actually extended approximately 75 feet out into the channel.

4. Beyond the Jacksonville Shipyards, to the North on Town Creek Lower Reach, is the Columbus Street Terminals of the South Carolina State Ports Authority, approximately 1000 to 1500 yards up river. Just to the South of Jacksonville Shipyards, there were other marine facilities, including the White Stack Towing Company dock and the United Fruit Company pier. Much farther up river were the North Charleston facilities of the Ports Authority.

5. Any vessel proceeding from the sea into Charleston Harbor up the Cooper River, with the intention of docking at the Columbus Street Terminals, must enter Custom House Reach. Thereafter, it may proceed in one of two ways: the shorter and preferable route is to alter course to port, proceed across the southern and western sectors of the Reach, turn back to starboard and proceed directly up Town Creek Lower Reach to destination. The other route, longer and for that reason less preferred, is to proceed along the eastern edge of Custom House Reach into Hog Island Reach and then to follow Drum Island Reach around Drum Island and back down Town Creek Upper Reach, then into Town Creek Lower Reach to its destination.

6. For several weeks prior to August 6, 1966, Latex had been engaged in the performance of a contract to do certain dredging in the Cooper River. The area to be dredged commenced only a few feet South of the floating drydock of the

Jacksonville Shipyards and extended Southwardly down Custom House Reach and Eastwardly directly across the channel and the entrance to Town Creek Lower Reach. Among other things, the contract specifications provided as follows:

"e. *Channel traffic.* Cooper River is used mostly by large ocean-going vessels requiring depths between 30 and 35 feet in their movements to and from facilities situated along its westerly shores. In addition to commercial shipping, the Cooper River is used extensively by Naval vessels.

"f. *Obstruction of channel.* The Government will not undertake to keep the channel free from vessels or other obstructions, except to the extent of such regulations, if any, as may be prescribed by the Secretary of the Army, in accordance with the provisions of Section 17 of the River and Harbor Act approved 8 August 1917. The Contractor will be required to conduct the work in such manner as to obstruct navigation as little as possible, and in case the Contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Upon the completion of the work, the Contractor shall promptly remove his plant, including ranges, buoys, piles and other marks placed by him under the contract in navigable waters or on shore."

Latex was also subject, in the performance of its contract, to the provision of Federal Statutes and the applicable Coast Guard Pilotage Rules.

7. In the performance of its contract, Latex was using the dredge NATCHEZ, which was a 20-inch hydraulic dredge approximately 100 feet in length. Its auxiliary equipment included other marine instrumentalities such as tugboats, pontoons carrying sections of pipeline, buoys and the like. Each pontoon section was 60 feet long, and could be linked together with adjoining sections. The dredge was held in position with its spuds on the bottom and could be moved from place to place by means of its tugs, or it was self-propelled in the sense that it could move itself by walking or swinging on its port or starboard spud and by pulling on its anchors. Its associated equipment consisted of tugs, a barge and a long pipeline lying on floating pontoons which carried the pipeline behind and generally to the North of the dredge to a submerged pipeline leading to the spoil area. These pipelines thus enabled the silt and dredged material from the river bottom to flow from the dredge's cutting head to the spoil area on Hog Island. In addition, the dredge had several floating buoys to mark the submerged anchors and a number of buoys to mark either side of the pipeline and the pontoons extending behind the barge to the submerged pipeline leading to the spoil area. These buoys were secured to the river bottom by cables 60 feet in length.

8. While Latex was engaged in the performance of this contract the Corps of Engineers received a number of complaints from the Charleston Local Pilots Association about Latex's operations. These complaints concerned the location or positioning in the channel of the terminal barge and of warning buoys and inadequate lighting at night, creating, as the pilots apparently considered, hazards to navigation in the channel.

9. On Saturday morning, August 6, 1966, the dredge NATCHEZ, making cuts 140 feet in width, had progressed in its dredging from the Western shore of Custom House Reach toward the center or Eastern portion of Custom House Reach. At 11:30 a. m., the dredge completed the Southern end of its cut in Custom House Reach and moved back to the Northern portion and began its next cut. At 5:30 p. m. the crank shaft on the dredge's pumping machinery broke down, which prevented further dredging until repairs could be made and completed. It was evident that repairs would require several days. The breakdown,

however, did not affect the dredge's ability to be moved. When the NATCHEZ broke down and stopped working, the dredge, its buoys, marking its anchors, and its pipeline on pontoons, were all in the channel of Custom House Reach near the entrance into Town Creek Lower Reach and in the area where vessels proceeding from Custom House Reach into Town Creek Lower Reach would make their approach and turn into Town Creek Lower Reach.

10. No steps were taken to remove the dredge and its equipment out of the channel during the time it would be disabled and unable to work.[1] On the contrary, its "spuds" were embedded where they were in the bottom, so that the dredge itself did not shift with the movement of the tide. In its fixed position, its bow pointed toward the South and its stern toward the North. Its pipeline extended from its stern in a Northerly direction for about 120 feet, then turned and extended about 300 feet in a Southwesterly direction to a "knuckle" at which point it turned again and extended about 1200 feet up the channel in a Northerly direction. In addition to the dredge and pipeline, Latex had placed a number of buoys South of the "knuckle" in an area about or just over the center of the channel at a point roughly between the White Stack and United Fruit Piers. The dredge, pipeline and buoys remained in this position, where the dredge had broken down,

from the afternoon of August 6 until the afternoon of August 11.

There is considerable dispute in the testimony with reference to the exact location in the channel of the dredge and its auxiliary equipment. There is no dispute that both the dredge and its auxiliary equipment were in the channel of Custom House Reach at and about the junction of Custom House Reach and Town Creek Lower Reach; in fact, it was so stipulated in the record by all parties. Town Creek Lower Reach as it connects with Custom House Reach has a channel of about 600 feet in width. It was customary and natural for vessels proceeding from Custom House Reach into Town Creek Lower Reach to proceed in largely a straight line through the Northeastern segment of Custom House Reach, making a slight curve to the right as they entered Town Creek Lower Reach. Under all the testimony, however, as a result of the location of the dredge and its equipment, vessels proposing to go through Custom House Reach into Town Creek Lower Reach were obliged to shift considerably to the South[2] and then turn rather sharply Northward up Town Creek Lower Reach.

The dispute between the parties centers on whether the entrance to Town Creek Lower Reach was so obstructed by the dredge and its equipment as to deny to inbound vessels a substantial part of the channel as they proceeded to enter

1. The record is confused on the issue whether the Corps of Engineers requested or suggested that Latex move its equipment and dredge out of the channel during this period when the dredge was disabled. At one point, during his direct examination, the representative of the Corps testified unequivocally that it had. This representative added that he assumed that Latex had "cleared the channel" of its equipment because, as he explained it, "it appears that since they knew they would be out of operation for sometime that they would." Recalled for "reredirect", over the objection of counsel for Captain Jenkins, the representative of the Corps of Engineers "clarified"

his earlier statement that he had requested Latex to clear the channel by testifying that he merely inquired of Latex whether any of its equipment represented an obstruction. He expressed himself as satisfied with Latex's reply that it was not obstructing the channel, and made no further inquiries or requests.

2. Captain Petterson, in piloting his ship through this channel, described the movement thus: "I had to take an extreme left to get in a position well to the south of this dredge—it was obstructing the channel to a certain degree—in order to enter Town Creek channel."

Town Creek Lower Reach. According to the testimony of pilot Jenkins, supported by that of Captain Petterson and inferentially at least that of Captain Mitchum, to both of whom subsequent reference is made, the location of the dredge and its equipment stretched sufficiently into the channel of Custom House Reach, as it connected with Town Creek Lower Reach, as to obstruct for inbound vessels partially the Eastern side of Town Creek Lower Reach as the vessel entered that Reach, leaving a narrow passage of about 250 feet, according to Captain Petterson, within which to navigate up the channel into Town Creek Lower Reach. The testimony of Latex, on the other hand, would indicate that the dredge and its equipment, while so located in Custom House Reach as to force inbound vessels to swing to the Southwest in approaching Town Creek Lower Reach, was sufficiently over to the East that practically the entire channel of about 600 feet was available for the approach of inbound vessels into Town Creek Lower Reach from Custom House Reach after they had made their swing to the Southwest.

I do not think the testimony of the pilots can be disregarded. After all, they were there in the channel at or about the time of the collision. It is a vital part of their profession to make accurate conclusions about the very matter in controversy. Their conclusions on such a matter should be given great weight. While it is true that both Captain Mitchum and Captain Petterson are pleasantly acquainted with pilot Jenkins, both impressed me as witnesses who attempted to be frank and candid and indicated no prejudice in favor of Captain Jenkins. I do not believe they colored their testimony to favor either side. The testimony of Latex consists, on the other hand, largely of the evidence furnished by its two employees, who were in charge of the dredge and one of whom, in a deposition given sometime before trial, disclaimed any knowledge of "how much room you would have to get through" into Town Creek Lower Reach as a result of the dredge's obstruction of the channel, and an engineer who made a drawing, based on an examination of certain photographs. If the obstruction of the channel was no more than Latex contends, there would have been little basis for the apprehensions of Captain Mitchum, who, as I shall later indicate, was the docking master in charge of the tugs intended to aid the HONG KONG CLIPPER in its docking and who, upon observing at first-hand the obstruction, felt that the dredge and its equipment narrowed the passage into Town Creek Lower Reach to such an extent as to make an entrance by an inbound vessel at full tide hazardous nor would Captain Petterson's testimony that the obstruction narrowed the passage into Town Creek Lower Reach to the Western side of the channel be credible.[3]

Giving weight to all the testimony, I am of opinion that the dredge and its equipment substantially obstructed the Eastern side of the channel of Town Creek Lower Reach as it connected with Custom House Reach and that such obstruction at flood tide rendered passage of vessels into such Town Creek Lower Reach hazardous. I am not certain that the channel was blocked as much as the pilots indicated on the Eastern side but I think it clear the channel was obstructed sufficiently to deny substantially to inbound vessels the full channel they needed for navigation from Custom House Reach into Town Creek Lower Reach at full tide.

---

3. In fact, Captain Petterson testified that, while at ebb tide, he had maneuvered the passage, "it wasn't too safe. I'd say that. It was a rather narrow passage— it was a rather narrow opening to make a passage through." Captain Petterson, who piloted a vessel through Custom House Reach into Town Creek Lower Reach at ebb tide about two hours earlier, found that the dredge and its equipment so blocked the passage into Town Creek Lower Reach that only about 250 feet were available for passage.

11. The HONG KONG CLIPPER is a Victory class ship, or merchant vessel, built in 1944 in Richmond, California. It is 456 feet– 3 inches in length, and 62 feet– 1⅝ inches in beam. Her gross tonnage is 7,607 tons and her net tonnage is 4,462 tons. The vessel is driven by two steam turbine engines and a single propeller. On the morning of August 7, 1966, the HONG KONG CLIPPER had a draft of 14 feet– 11½ inches forward and drew 20 feet– 7 inches aft. The vessel was registered under the laws of the Republic of Liberia and flew the Liberian flag. Her complement of officers and crew were Chinese, and the vessel was owned and operated by Overseas Maritime Co., Inc., a corporation under the laws of the Republic of China, Taiwan.

12. The third-party defendant, Arthur J. Jenkins, is an experienced and competent Charleston Harbor pilot. He graduated from The Citadel in 1951 with a degree in electrical engineering. His engineering experience included courses in mechanical drafting, land surveying, aerial photography and temporary work with the Army Engineers. After serving two years in the United States Air Force and attaining the rank of Captain, he entered the apprenticeship program of the Charleston Branch Pilots Association and completed the three-year apprenticeship program before qualifying for, passing and obtaining his Federal (United States Coast Guard) license and his State license as a 20-foot branch Charleston Harbor Pilot in 1960. After further service as a Charleston Harbor Pilot, he qualified for and obtained his Federal and State licenses as a 25-foot branch pilot. In November, 1964, he obtained his full branch pilot's license and has had extensive experience in piloting many types of ocean going vessels, including numerous Victory ships, in Charleston Harbor.

13. On the morning of August 7, 1966, at approximately 7:40 a. m., the third party defendant, Arthur J. Jenkins, boarded the HONG KONG CLIPPER at the sea buoy in the Atlantic Ocean off the entrance of Charleston Harbor for the purpose of piloting the vessel to its destination in Charleston Harbor. Shortly after boarding, he learned from his office dispatcher ashore by way of voice radio that its destination was Berth No. 2 at the Columbus Street Terminals and that tugs would be present to dock the vessel starboard side to the pier. There was a light wind blowing from the Westsouthwest at about ten miles per hour and the tide was flooding. Visibility was clear and good for a distance of several miles.

14. At 7:42 a. m., the pilot ordered the engine full ahead and proceeded to enter Charleston Harbor. The pilot also instructed the Chief Officer to ready the port anchor and stand by the starboard anchor. The Chief Officer on the foc'sle saw that the turnbuckles were taken off both anchors and he lowered the port anchor from the hawsepipe to ready it for dropping, and braked the port anchor with the port wheel brake. In addition, the Chief Officer also readied the starboard anchor by disengaging the starboard gear and braked the starboard anchor with its wheel brake. Thus both anchors were held in place only by their respective friction brakes and were in a state of readiness for dropping.

15. The vessel proceeded into the harbor under orders given by the pilot. Stationed on the foc'sle head at the bow were the Chief Officer, a carpenter, and the bos'n. On the bridge in the wheelhouse with pilot Jenkins were the ship's Master, a third mate at the engine order telegraph, and the helmsman. In the engine room with the Chief Engineer were six of the ship's Engineering Department, which included the Second Engineer at the engineroom telegraph, an electrician and fitter at the engineroom bell book table, the Fourth Engineer at the engine valves, and an oiler and a fireman.

The pilot knew that the dredge NATCHEZ and her pontoons were somewhere in Custom House Reach, but he did not know the exact location or that the dredge was not working. During

the transit of the vessel into the harbor from the sea buoy, pilot Jenkins called his pilot boat on his VHF walkie-talkie radio and requested it to contact the dredge and ascertain the position of the dredge in Custom House Reach, through which the pilot intended to proceed en route to his destination in Town Creek, and to inquire on which side the dredge wanted the vessel to pass.[4] This message was immediately relayed by the pilot boat to the dredge on the dredge's voice radio frequency. The dredge answered that the vessel should pass on the dredge's starboard side and that the dredge was all clear. The dredge's answer was relayed back by the pilot boat to pilot Jenkins.

16. Thereafter, and during the vessel's transit into the harbor, the Docking Master on one of White Stack Towing Company's tugs, Captain R. C. Mitchum, an experienced docking master who had earlier that morning at six o'clock docked a Mariner class vessel, the S/S PIONEER MIST, 565 feet in length and a beam of 74 feet, at Columbus Street Terminals in Town Creek after that vessel had transited Custom House Reach on a slight ebb tide, informed the White Stack dispatcher that he felt it was best for the HONG KONG CLIPPER to come around the Island, because the dredge and its pipeline would be a hazard, and he was concerned about the HONG KONG CLIPPER being able to make it past the dredge's position. The docking master was of the opinion, based on his personal observation, that the dredge was in a bad position and was hazardous to the approach of the HONG KONG CLIPPER on a flood tide.

17. The White Stack dispatcher, Mr. O'Quinn, who relayed the message from Captain Mitchum to the Pilot Association's office by telephone, however, merely suggested that the pilot go around the Island without giving any reason. Thereupon, Mr. Murrow, the Pilot Association's dispatcher, communicated with pilot Jenkins on the HONG KONG CLIPPER by VHF voice radio and relayed the message that Captain Mitchum had suggested the vessel be brought around Drum Island. Pilot Jenkins testified that he "called him (i. e., Murrow) back and said, 'For what reason? Why?' He said, 'I'll find out.' So, a few minutes later, five minutes, or whatever time it took to get through to the tug company, he came back and the tug said, 'Okay.' And that was his very words that I recall."

18. Thereafter, Jenkins piloted the vessel on various courses in the channel of Cooper River. On arriving in Shutes Reach, at which time the tide was about mid-flood and the wind was from the Westsouthwest at 10 knots, the pilot proceeded on a course of 305 degrees and then reduced the vessel's speed to half ahead of 0834. The pilot could see the dredge about 1500 feet ahead in Custom House Reach, and in accordance with the Coast Guard Pilotage Rules,[5] Jenkins signalled the dredge with one long blast on the ship's whistle to inquire whether the passage was clear and

---

4. The pilot could not, via his radio, talk directly with the dredge and was required to communicate through the pilot boat, which did have radio communication with the dredge.

5. Title 33 of the Coast Guard Pilotage Rules (33 CFR Sec. 80.26) pertaining to "Passing Floating Plant Working in Navigable Channels" provides, in part, as follows:

"§ 80.26.  *Passing Signals.*

"(a) Vessels intending to pass dredges or other types of floating plant working in navigable channels, when within a reasonable distance therefrom and not in any case over a mile, shall indicate such intention by one long blast of the whistle, and shall be directed to the proper side for passage by the sounding by the dredge or other floating plant, of the signal prescribed in the local rules for vessels under way and approaching each other from opposite directions, which shall be answered in the usual manner by the approaching vessel. If the channel is not clear, the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant."

to inquire on which side he should pass the dredge. The dredge promptly replied with two short blasts of its whistle, directing the vessel to pass to the West of the dredge, i. e., starboard to starboard (between the dredge's plant and the drydock), which signal the pilot acknowledged. At his station on the bridge of the vessel, the pilot had at this time a view of the dredge and a general outline of its buoys and pipelines. It is probable that, due to the shifts in direction of the pipeline, he did not completely descry the exact configuration of the pipeline and the buoys that were connected with the dredge's operation in the channel, though I am of opinion that a careful and cautious visual inspection at this point by the pilot should have indicated to him that he would not have the full channel of Town Creek Lower Reach within which he could maneuver his entrance into such Reach. Actually, the pilot placed undoubtedly too much reliance on the signal given him by Latex and assumed too readily that the channel was clear.

19. At 0835, the pilot ordered slow ahead in Horse Reach, where the channel of the Cooper River forks to the left and intersects Custom House Reach, to go West and enter Town Creek Lower Reach through Custom House Reach.

20. Going slow ahead at the junction of Horse Reach and Custom House Reach, the pilot ordered hard left (port) rudder and rounded Beacon No. 9 located on the left or Western edge of Horse Reach Channel, so as to transit Custom House Reach and stay well clear and South of the dredge. Had the dredge and its pontoons not been out in the channel of Custom House Reach, the vessel could, as I have already indicated, have proceeded on a relatively straight course directly through Custom House Reach into Town Creek Lower Reach.

21. After altering course to port and rounding No. 9 Beacon on his left and actually proceeding out of the channel of Custom House Reach and South of the dredge so as to avoid having the flood tide of 1½ knots set the vessel up from the South into the dredge on the North, at 0835½ the pilot ordered the engine stopped, and then eased the left rudder off to straighten out his turn, and put the rudder amidships to head generally West toward the United Fruit Company and thus stay South and clear of the dredge and its pipeline, to enable him to make his next turn to starboard to enter Town Creek Lower Reach around the dredge and its pipeline.

22. Proceeding with headway toward United Fruit Company on a stop bell and rudder amidships, the pilot could observe the Southern position of the dredge and its pontoons. He then headed the vessel toward United Fruit Company so as to keep well clear of the dredge and its appurtenances on the flooding tide. At 0836½, as his perspective up Town Creek opened up, the pilot realized that he had not reckoned on the equipment of the barge being as far out in the channel as he then observed it to be and he knew that he was faced with a difficult situation. He ordered hard right (starboard) rudder and slow ahead on the engine to make his right or starboard turn into the elbow of or entrance to Town Creek Lower Reach and around the dredge's Southern and Westernmost pontoons and buoys. The bow of the vessel turned slowly to starboard. The two tugs which were to dock the vessel were lying off of Seaboard Dock South of United Fruit Company. As the bow responded slowly and the ship came to the right, the pilot observed that there was only what he fixed as about 250 feet between the channel-end of the drydock and the line of floating buoys West of the dredge's pontoons.

23. As the bow swung slowly to starboard with headway and the propeller turning slow ahead, and realizing that he was going to have difficulty completing the starboard turn around the buoys and making the passage through the restricted opening between the dredge's buoys and pontoons on the East and the floating drydock jutting out into the channel on the West, at 0838 the pilot

ordered full astern to help bring the vessel's bow around to the right with port stern torque from the propeller. He saw the Third Officer move the bridge telegraph to the full astern position, and he saw the engineroom respond at once by moving its own telegraph full astern, which made the engineroom indicator on the bridge telegraph move accordingly. He also heard the bell on the indicator ring. Shortly thereafter, the ship not seeming to be responding, he again ordered full astern "with a jingle" and he saw both the Mate and the Captain move the telegraph handles. By that time he felt that the ship was in an emergency situation and he simultaneously ordered both anchors dropped.

24. A steam turbine engine such as that in the HONG KONG CLIPPER does not respond to a full astern order as quickly as a more modern plant. In normal operation, on a steamship which is proceeding at slow ahead, the engine order telegraph must first be put at the stop position before being put in the astern position. In the engineroom, the watch officer must first close the valve of the ahead throttle, and then open the astern valve. It will then take some little time before the steam turbine can drive the propeller shaft to its maximum RPMs. When the engineroom watch officer on the HONG KONG CLIPPER saw the telegraph move from slow ahead to full astern without any pause, he knew without being told that an emergency was involved. Almost simultaneously, he began to turn the wheel which closed the ahead throttle, and thereafter spun the wheel which opened the astern throttle. By the time the "jingles" had been given, the engine was already full astern. Both the Captain and the Mate moved the telegraph, but by this time the ship was *in extremis* and almost simultaneously with the engine order the pilot ordered the anchors dropped. At this point in time, the stem of the ship was about 600 feet from the drydock, moving, according to the pilot, at a speed of one knot or less through the water.

25. The brake on the port windlass and the port anchor, which was hanging down only two feet from the water, were dropped. With one shackle of chain in the water (90 feet) the windlass was braked, and the chain became tight. Immediately thereafter, at 0840, the stem of the ship touched the drydock at a point about 15 feet from its outboard end, and penetrated it for a distance of eight to ten feet. By this time the ship was vibrating heavily from the effect of the propeller going full astern, and she had no sooner touched the drydock when she began to gather sternway. She backed out into the river with her stern now swinging to starboard, toward the dredge's pipeline. At 0840½, her engine was stopped and her anchor was raised. She was still at an angle to the channel, and Captain Jenkins ordered her engine first half ahead and then full ahead to straighten her out. She then proceeded up river to her destination.

26. It is clear that Latex violated the terms of its contract with the Army Engineers by obstructing the channel so as to "make difficult or endanger the passage of vessels" through the same and that it was also in violation of Section 409 of Title 33 of the United States Code, in unlawfully anchoring its dredge, pipeline and related equipment in such a position in the navigable portions of Custom House Reach and Town Creek Lower Reach that they "prevented or obstructed the passageway of other vessels or craft". By its obstruction, it narrowed by practically half the passage through which vessels were forced in a rather difficult maneuver under any circumstance, to proceed inbound at the connection of Town Creek Lower Reach with Custom House Reach. It was manifestly chargeable with notice of the hazard it had created and maintained, a hazard tht it must have known was aggravated during flood tide. It clearly owed an obligation under the Pilotage Rules [6] to warn the approaching vessel,

6. See Note 5.

in answer to its blast, that the channel was not clear and that any attempt at passage, with the tide as it was, was hazardous and dangerous. It gave no such warning instruction. To the contrary, it incorrectly and negligently advised the approaching vessel that the channel was clear and told it to proceed into Town Creek Lower Reach. It thereby induced, if not misled, the pilot of the HONG KONG CLIPPER into attempting to enter Town Creek Lower Reach for his journey up to the Columbus Terminal and invited the very disaster that resulted to the dock of the Jacksonville Shipyards. Its action represented negligence and, even if not solely responsible, it certainly contributed proximately to the collision.

27. Latex contends that, since another ship passed without accident by the dredge going from Custom House Reach into Town Creek Lower Reach some hours before the HONG KONG CLIPPER, it is obvious that the dredge, though anchored in the channel, was not a hazard and that the difficulties encountered by the HONG KONG CLIPPER were due to its improper navigation. This argument overlooks the fact that the earlier passage occurred at ebb tide, whereas the HONG KONG CLIPPER was making its passage at practically full tide. It was this latter fact, considered in the light of what he had observed during the passage of the earlier vessel, that caused Captain Mitchum to suggest that HONG KONG CLIPPER not attempt the passage. Captain Mitchum recognized the danger presented by the dredge and its auxiliary equipment to the use of the channel by inbound vessels at flood tide. The pilot, who had brought in the earlier vessel, also recognized the hazard created by Latex for any vessel entering Town Creek Lower Reach at flood tide. When asked specifically whether he would attempt the passage again, replied: "Well, if I had favorable weather conditions, with a head tide, and the ship that I was on was supposed to go port side to Co-lumbus Street dock, I would attempt to go through again, yes, sir."

28. I accordingly find that the position of the dredge NATCHEZ and its pipeline and buoys constituted an obstruction to the navigable channel, that Latex Construction Company was negligent in allowing its equipment to remain there and that such negligence contributed proximately to the collision of the HONG KONG CLIPPER with the drydock of Jacksonville Shipyards.

29. I find that the Captain and crew of the HONG KONG CLIPPER were not guilty of any negligence contributing proximately to the collision. Under all the circumstances and considering the situation of the vessel at the time, their actions were reasonable and conformed to reasonable standards of proper seamanship.

30. The most difficult question in this case concerns the contention that the pilot of the HONG KONG CLIPPER, Captain Jenkins, was guilty of negligence in the operation of the vessel and that such negligence contributed to the collision.

In this connection, I do not find that the pilot was guilty of any negligence after he began and while he was engaged in his actual maneuver by the dredge and its auxiliary equipment, as he sought to proceed from Custom House Reach into Town Creek Lower Reach. Giving proper consideration to the situation in which he then found himself, he exercised, in the management of the vessel during that time, that degree of skill and judgment that could fairly be expected of a competent pilot. It is easy enough after the event, to suggest that the pilot should have taken some other action at a particular point in his maneuver. But his conduct is not to be judged by the yardstick of such "after-wisdom"; the issue is whether his actions, as taken, were such as "nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances".

Measured by this standard, I am convinced and so find that his action, after he began and during his maneuver into Town Creek Lower Reach, conformed to the standards of reasonable care, prudence and skill of his profession.

■ This leaves for consideration the more difficult question whether the pilot was negligent, however, in undertaking the entrance into Town Creek Lower Reach. He had been advised that Captain Mitchum felt he should not attempt the passage. It is true he was given no reason for Captain Mitchum's suggestion but it would seem that he should have concluded it was not an idle suggestion. Moreover, as he approached the location of the dredge at a distance of at least 1500 feet, he had an opportunity for a visual evaluation of the obstruction created by the location of the dredge and its equipment. It may well be that such visual observation may not have marked out for him at the time the full extent of the blocking of the channel but certainly it was enough to caution him in his approach at the least. When considered in the light of Captain Mitchum's suggestion, his visual evaluation should have prompted him to consider anew whether to attempt the passage into Town Creek Lower Reach. He chose, however, to rely upon the advice of the dredge that the channel was clear and to proceed into Town Creek Lower Reach. While such advice from the dredge cannot relieve the pilot from the obligation to use his own judgment, it is understandable why he chose to follow the advice of the dredge and to determine his course by such advice. He had a right to assume that the crew of the dredge knew better than anyone else the location of their equipment and the extent to which it obstructed or did not obstruct the channel. The crew of the dredge also knew, or should have known, the conditions of the tides at the moment. Theirs was a superior knowledge of the situation and the pilot certainly was entitled to take this fact into consideration in determining whether to continue his maneuver up Town Creek

Lower Reach. It is obvious, though, that Latex was the author of such mistake as may attach to the conduct of the pilot. Latex induced his action; it invited him to continue his passage into Town Creek Lower Reach and not to shift to passage around Drum Island. It seems harsh that Latex should, under those circumstances, having by its own conduct induced what it contends was an erroneous action on the part of the pilot, be able to foist upon the pilot equal liability for what is in fact, almost entirely, the consequences of its own wrongful conduct and advice. To find, in this context, that the mistake of the pilot constituted negligence, the evidence of his negligence should be clear and convincing and any doubt should be resolved in his favor. A/S Skaugaas (I. M. Skaugen) v. T/T P. W. Thirtle, 227 F.Supp. 281 (D.C.Md.1964), aff. 345 F.2d 275, cert. den. 382 U.S. 918, 86 S.Ct. 292, 15 L.Ed.2d 233. I do not find that the evidence is so clear and convincing and, though the pilot may have committed a mistake in undertaking his passage into Town Creek Lower Reach, I do not find that it was of such a character as to warrant imposing an apportionment of damages or that it may not be appropriately "glazed over". See Oriental Trading & Transport Co. v. Gulf Oil Corp. (2d Cir. 1949) 173 F.2d 108, 111, cert. denied 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728.

## CONCLUSIONS OF LAW

The Court concludes,

1. That Latex Construction Company was negligent and guilty of statutory fault and that its negligence and statutory fault were the sole proximate cause of the collision and the ensuing damages.

2. That Arthur J. Jenkins was not negligent and his actions and conduct were not a legally contributing cause of the collision and the consequent damages.

3. I find that the HONG KONG CLIPPER was under the sole command of Captain Jenkins, and that her offi-

cers and crew were not chargeable with any fault sufficient to impose liability upon her owners.

4. That the defendant Overseas Maritime Company, Inc. is entitled to judgment over against Latex Construction Company for its damages, disbursements and costs.

5. That Latex Construction Company is liable for the costs and disbursements incurred by the parties to this action.

And it is so ordered.