**LATEX CONSTRUCTION COMPANY, Third-Party Defendant/Appellant,**

and

**Latex Construction Company, as owner of the DREDGE NATCHEZ, Third-Party Plaintiff/Appellant,**

v.

**JACKSONVILLE SHIPYARDS, INC., Charleston Division, a South Carolina Corporation, Plaintiff/Appellee,**

and

**A VESSEL, HONG KONG CLIPPER of Orient Overseas Lines, Her Engines, Boilers, Tackle, etc., Defendant/Appellee,**

and

**Overseas Maritime Co., Inc., Claimant & Third-Party Plaintiff/Appellee,**

and

**Arthur J. Jenkins, Third-Party Defendant/Appellee.**

**No. 14488.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 10, 1970.

Decided May 3, 1971.

Augustine T. Smythe, Charleston, S. C. (Buist, Buist, Smythe & Smythe, and Bigham, Englar, Jones & Houston, Charleston, S. C., on brief), for appellant.

D. A. Brockinton, Jr., Charleston, S. C. (Edward R. Downing, Miami, Fla., on brief), for appellee Arthur J. Jenkins.

B. Allston Moore, Jr., Charleston, S. C. (Moore, Mouzon & McGee, Charleston, S. C., on brief), for appellee Overseas Maritime Co., Inc.

Before SOBELOFF,[*] WINTER and CRAVEN, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

On the morning of August 7, 1966, the steamship HONG KONG CLIPPER struck a drydock while approaching her assigned berth at the Columbus Street Terminal at Charleston Harbor, South Carolina. The central question in this case is which of three defendants was guilty of negligence proximately contributing to the mishap.

The District Court placed sole responsibility on Latex Construction Company, owner of the dredge NATCHEZ which was blocking part of the normal approach channel to the harbor.[1] It is

---

[*] Judge Sobeloff attained the status of Senior Circuit Judge on December 31, 1970.

[1]. Jacksonville Shipyards, Inc. v. A Vessel HONG KONG CLIPPER, 309 F.Supp. 1196 (D.S.C.1970).

our conclusion that Arthur J. Jenkins, pilot on the HONG KONG CLIPPER, was also guilty of negligence contributing to the accident.

I

Charleston Harbor [2] runs roughly in a north and south direction, the northern portion angling slightly to the northwest. The Columbus Street Terminal, where the HONG KONG CLIPPER was to dock, is the furthest north docking area in the harbor and is located just opposite the southern tip of Drum Island. Because of the presence of Drum Island and shallow water to the south of the island, the Columbus Street Terminal cannot be approached directly from the. east; access is by means of Town Creek Lower Reach to the south or Town Creek Upper Reach to the north. Since the channel from the open sea approaches from the southeast, the route to the Columbus Street Terminal is shorter by several miles if the approach is made from the south by means of Town Creek Lower Reach rather than from the north which entails circling Drum Island.

South of Drum Island and the adjacent shallow water, and east of the southern portion of Town Creek Lower Reach lies Customhouse Reach. Because there is a second, smaller island to the south of Customhouse Reach, ships approaching from the sea must steer a west-northwest course through Customhouse Reach and then turn to starboard in order to head up Town Creek Lower Reach toward the Columbus Street Terminal. The Jacksonville Shipyards drydock is just opposite the "corner" where this turn is made—roughly one thousand yards south of the Columbus Street Terminal.

At the time of the accident from which this legal action arises, the dredge NATCHEZ was situated in the channel at the "corner" of Customhouse Reach and Town Creek Lower Reach. Because the NATCHEZ was occupying a portion of the channel, Pilot Jenkins aboard the HONG KONG CLIPPER was forced to make a wider starboard turn than usual and in doing so came in contact with the drydock before he was able to complete the turn and steady on a course up Town Creek Lower Reach.

Jacksonville Shipyards commenced this action *in rem* against the HONG KONG CLIPPER, and *in personam* against Overseas Maritime Company as owner of the ship. Overseas Maritime impleaded Latex Construction Company, owner of the NATCHEZ. Latex in turn impleaded Pilot Jenkins, against whom Overseas Maritime filed a cross-complaint. Jacksonville Shipyards is technically no longer interested in the outcome of this litigation because Overseas Maritime and Latex Construction have paid the $255,000 agreed upon by the parties as the amount of damages to the drydock. However, before it can be determined under appropriate legal principles which of the three defendants should ultimately bear the cost, it is necessary to determine which of the three defendants are at fault. As previously noted, the District Court found error only in the actions of Latex Construction.

II

■ The District Court was clearly correct in its determination that the dredge was negligent in its actions and that "if not solely responsible, it certainly contributed proximately to the collision." [3] Because on appeal Latex does not attempt to escape liability altogether, but argues that the accident was the joint fault of the dredge and the pilot, we adopt the District Court's discussion of the faults of the dredge without further elaboration here.[4]

■ We also uphold the District Court's finding that "the Captain and crew of the HONG KONG CLIPPER

---

2. See the chart of Charleston Harbor which is appended to this opinion.

3. 309 F.Supp. at 1206.

4. *Id.* at 1205–1206.

were not guilty of any negligence contributing proximately to the collision,"[5] since the ship was under the sole command of Pilot Jenkins throughout the period with which we are concerned here. This brings us to the question whether Jenkins was guilty of any negligence in his handling of the ship—as the District Court well characterized it, "[t]he most difficult question in this case."[6]

In assessing Jenkins' actions two distinct questions are raised: (1) Was he negligent in taking the ship through Customhouse Reach rather than going around Drum Island? and (2) Was he negligent in his handling of the ship once he embarked on the route by way of Customhouse Reach and Town Creek Lower Reach? Because we conclude that Jenkins erred in failing to take the longer route around Drum Island, we need not consider his handling of the ship once he selected the other route.

Pilot Jenkins boarded the HONG KONG CLIPPER near the sea buoy at 7:40 a. m. During the subsequent maneuvers of the ship his sole means of communication was a portable radio with which he could contact only the pilot boat; all communications with other vessels had to be relayed through the pilot boat. As the ship proceeded in toward Customhouse Reach, Jenkins inquired of the dredge, through the pilot boat, whether the channel was clear and on which side he should pass the dredge. The pilot boat informed him that the dredge said the channel was clear and that he should pass starboard to starboard.

However, Jenkins was also told by the pilot boat that the tugs waiting to assist the ship in docking advised that he should "[g]o around the island." When Jenkins inquired as to why he should go that way, the pilot boat indicated that it would try to find out. The only answer that Jenkins received was a non-responsive and ambiguous message that

the tugs said, "Okay." He sought no further clarification.

As the HONG KONG CLIPPER neared Customhouse Reach, Jenkins blew one long whistle blast as an inquiry to the dredge whether the channel was clear and on which side the dredge should be passed. The dredge responded with two whistle blasts, directing the ship to pass starboard to starboard. Jenkins proceeded into Customhouse Reach, and passed the dredge starboard to starboard, but in doing so failed to clear the Jacksonville Shipyards drydock.

On the morning of these events there was a light wind blowing from the west-southwest. Visibility was good and clear for a distance of several miles. Jenkins, approaching from the east-southeast, should have had no difficulty perceiving the extent of the dredge's southward protrusion into the channel. Although gauging the westward obstruction of Town Creek Lower Reach would have been more difficult, visibility was good, and Jenkins was perched at a favorable vantage point 65 feet above the water. Also, he was familiar with the harbor and accustomed to visually judging distances for making safe turns through Customhouse Reach to berth at various docking areas in the harbor. As the District Court noted "a careful and cautious visual inspection at this point by the pilot should have indicated to him that he would not have the full channel of Town Creek Lower Reach within which he could maneuver his entrance into such Reach."[7]

As Jenkins approached the juncture where he would have to choose whether to enter Customhouse Reach or turn north to circle Drum Island, he was aware that the flooding tide would aggravate the difficulty of turning from Customhouse Reach into Town Creek Lower Reach. He admitted at trial that the route around the island, though longer, would have been safer. Since he knew that the ship was to berth star-

---

5. *Id.* at 1206.

6. *Id.*

7. *Id.* at 1204.

board side to the dock, taking the longer route also would have afforded the advantage of enabling him to berth the ship without first having it turned around by tugs off the Columbus Street Terminal.

■ Considering Jenkins' familiarity with the harbor, his ability to judge the dredge's approximate location, his admitted recognition of the difficulty of executing a starboard turn past the dredge on a flood tide, and his receipt of a warning to go around the island from tugs which he knew to be in a better position to judge the obstruction of the channel, we hold that Jenkins was negligent in choosing the shorter route. Our principal disagreement is with the District Court's conclusion that the dredge induced Jenkins' action, invited him not to shift to passage around Drum Island, and thereby was "author" of whatever error was committed.[8] We think the District Court's view mistaken in overstating the extent of both Jenkins' reliance on the dredge's whistle signals, and, by implication, the dredge's legal obligations to the ship.

The Coast Guard regulation governing signals to be used in situations where a ship is to pass a dredge working in a navigable channel is 33 C.F.R. § 80.26, the relevant portion of which reads as follows:

§ 80.26 *Passing signals.*

(a) Vessels intending to pass dredges or other types of floating plant working in navigable channels, when within a reasonable distance therefrom and not in any case over a mile, shall indicate such intention by one long blast of the whistle, and shall be directed to the proper side for passage by the sounding, by the dredge or other floating plant, of the signal prescribed in the local pilot rules for ves-

sels under way and approaching each other from opposite directions, which shall be answered in the usual manner by the approaching vessel. If the channel is not clear, the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant.

■ The single whistle blast given by the HONG KONG CLIPPER signaled an intention to pass and a request for directions whether to pass to port or starboard. The last sentence of the regulation imposes on a dredge only the duty to warn if the channel is not clear for passage. It does not impose an obligation to warn that the channel is narrowed if the channel is still sufficiently clear to allow passage; it does not impose an obligation on the dredge to weigh the merits of that route against those of other available channels. And a dredge's determination not to give a warning signal—whether correct or incorrect under the particular circumstances—does not relieve the pilot from the obligation to use his own judgment whether to attempt the passage under the circumstances as he should reasonably be able to perceive them. .

Moreover, Jenkins specifically testified at trial that he attempted the route past the dredge in reliance on his own judgment with respect to the amount of clearance available, and not in reliance on any information received from the dredge. We hold that his judgment was erroneous and that he must share responsibility for the resulting misadventure.[9]

Accordingly, the judgment is affirmed in part and reversed in part, and the case is remanded for further orders and proceedings consistent with this opinion.

8. *Id.* at 1207.

9. Because the issue has not been briefed or argued to us by the parties, nothing in the opinion is intended to reflect on the liability or nonliability of the ship for Jenkins' negligence. *See* Gilmore and Black, The Law of Admiralty 429–30 (1957) ; Burns Bros. v. The Central R. R. of New Jersey, No. 42, 202 F.2d 910 (2d Cir. 1953).

# APPENDIX

"Chart of Portion of Charleston Harbor"
Reproduced from Coast and Geodetic Survey Chart 470.