TURECAMO MARITIME, INC., Plaintiff,

v.

WEEKS DREDGE NO. 516, her tackle engines, boilers, etc., in rem, and Tug Gregory, her tackle, engines, boilers, etc., in rem and Weeks Marine, Inc., in personam, Defendant.

No. 92 Civ. 2542.

United States District Court,
S.D. New York.

Dec. 9, 1994.

Chalos & Brown, P.C., New York City, for plaintiff.

Connell Losquadro & Zerbo, New York City, for defendant.

*OPINION and ORDER*

SCHWARTZ, District Judge:

### JURISDICTION

This action arises out of an allision on the Hudson River in the vicinity of the cities of Athens and Hudson, New York, between plaintiff's tugboat the CATHERINE TURE-CAMO (the "CATHERINE") (towing the empty tank barge B–45 belonging to an unrelated third party) and an anchor cable of the anchored dredge belonging to defendant Weeks Marine, Inc. This Court conducted a bench trial on June 21–24, and 28, 1994 and July 15, 1994. Jurisdiction is based on 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure and is uncontested.

### BACKGROUND

The following uncontested facts serve as a description of the parties and vessels. Plaintiff Turecamo Maritime, Inc. ("Turecamo") owns and operates a fleet of tugboats including the CATHERINE, a 4000 horsepower, twin propeller, steel tug. At all material times Turecamo owned and operated approximately 29 tugboats of various sizes and power in several ports on the east coast of the United States, with about 12 of them assigned to the Port of New York and its tributaries. Turecamo engages in the business of general towing (of barges) and ship docking.

Defendant Weeks Marine, Inc. ("Weeks") is, among other things, in the marine construction business and owns and operates a fleet of crane barges and tugboats. These are used on construction projects including dredging. At the relevant time, Weeks owned and operated dredge # 516 ("WEEKS # 516"), a crane barge having no motor power or steering facilities of its own, and the tug GREGORY, an assist tug of 900 horsepower, measuring 60 feet in length and having a deep draft of about 7 feet.

The CATHERINE measures 99 feet in length. At all material times, the tug carried a crew of 5 consisting of a Captain, Mate, two deckhands and one engineer. The Captain and Mate, each with one deckhand, stand six hour alternating watches 24 hours a day.

The CATHERINE has a pilothouse measuring 10 to 12 feet in width, port bulkhead to starboard bulkhead, and about 10 feet deep from the after bulkhead to the forward windows. She is equipped with navigational equipment which was operational at all relevant times, including radar, compasses, and VHF radios for communication with other vessels. She also carried navigation charts (NOAA charts) with parallel rulers and dividers for measuring distances and plotting courses on a chart.

WEEKS # 516 is 160 feet long and is equipped with a large bucket crane located at the bow. The boom length is 185 feet. The total distance from the water line to the top of the boom is 200–225 feet. It is an anchor dredge which holds itself in position with four large anchors which are set out from each corner of the dredge. Each anchor is secured to a 1¼ inch diameter steel cable connected to and coiled on four large drums located amidship on the port side. The two double drum winches for the anchors are located in the "mate's shack". Several VHF marine frequency radios are aboard, one each for the shift supervisor, the crane operator and the mate. VHF channel 67 (Weeks' working channel) is usually used by the dredge crew for their work. The GREGORY, equipped with two such radios, monitors two channels at all times: channel 67 for communication with the dredge crew and channel 13 for communication with other vessel traffic in the river.

### FINDINGS OF FACT

#### (1)

Some time prior to the fall of 1991, Iroquois Gas Transmission ("Iroquois Gas") contracted with Pentzien, Inc. ("Pentzien") to act as the general contractor for the installation of Iroquois Gas' natural gas pipeline which was to extend from Canada to Long Island. Pentzien retained Weeks to act as a subcontractor on this project for the purpose of digging and backfilling a subaqueous trench across the Hudson River where Iroquois Gas'

pipeline was to be laid. Weeks began the dredging operation in early September, 1991 and completed the operation in mid-November, 1991.

### (2)

The width of the Hudson River from bank to bank where the subaqueous trench was to be dug and where the pipeline was to be laid is approximately 2,500 feet. According to the National Oceanic and Atmosphere Administration Chart No. 12347 ("NOAA Chart"), the chart to which mariners refer in transmitting this area, the width of the navigable channel at this site is 400 feet. The 400 foot channel depicted on the NOAA Chart is referred to as the project channel and constitutes the section of river which was dredged and is currently maintained by the Army Corps of Engineers for the safe transit of vessels. Army Corps of Engineers Chart, Pl.Exh. 25. The project channel is marked by floating aids to navigation, known as navigation buoys, positioned outside—east and west—of the project channel. In practice, the navigable channel extends at least to the navigation buoys. On the evening of October 15, 1991, the date of the allision, the red 78 buoy ("78 buoy"), located approximately 100 feet east of the project channel, and just south of the dredge site, marked the eastern edge of the navigable channel.

### (3)

The WEEKS 516 was manned by marine construction personnel and operated 24 hours a day with three eight hour shifts: 7:00 a.m.—3:00 p.m.; 3:00 p.m.—11:00 p.m.; and 11:00 p.m.—7:00 a.m.. The WEEKS 516 was anchored with four Dansforth anchors, each weighing approximately 10,000 pounds. One anchor was set out from each corner of the dredge—two bow anchors (port and starboard anchors) and two stern anchors (port and starboard anchors). Each anchor was connected to the WEEKS 516 by steel cable approximately 1¼ inch in diameter.

### (4)

The Tug GREGORY supported and assisted the WEEKS 516 in performing the dredging operation. Periodically, the GREGORY would set out the WEEKS 516's bow anchors. The GREGORY was also used to shuttle crews from and to shore. The GREGORY, a sixty foot tug boat with a seven foot draft, was manned by three Weeks' employees. The WEEKS 516 and the GREGORY communicated with each other on VHF Channel 67, Weeks' work channel. The GREGORY also had the task of monitoring the bridge to bridge communication channel, VHF Channel 13, in order to communicate with approaching vessels. The CHRISTIE, another small boat, was used for transporting Weeks personnel from and to shore when the GREGORY was otherwise occupied.

### (5)

Aboard the WEEKS 516 there were two sets of hydraulic driven winches which were the means by which the dredge moved forward or backward towards its anchors. Although the WEEKS 516's winches had the capacity to pull in on the anchor cables, the winches could not mechanically "pay-out" (slacken) the cables. Instead, Weeks personnel had to manually slacken the dredge's bow and stern anchor cables, using one of three methods.

The first two methods involved the use of the GREGORY, while the third method was used when the GREGORY was not available. The first method involved using the GREGORY to push or pull the dredge off the trench's center line, which caused one cable to be slackened. The process would then be repeated for the second cable. The second method involved using the dredge's crane bucket. The crane bucket would push each cable to the bottom while the tug held the dredge on line. The third method also employed the dredge's crane. The crane operator, using the crane bucket, would grab the river bed and swivel the crane boom back and forth to slacken the cables, one at a time.

### (6)

### The Setting Out and Location of the WEEKS # 516 Anchors on October 15, 1991

Based on the testimony of Captain Davenport, captain of the GREGORY, we find that on the afternoon of October 14, 1991, the Gregory set out the WEEKS 516's two bow anchors on the east side of the river. In

setting the port (northern) bow anchor, the GREGORY's crew picked up and tied the port bow anchor buoy to a cleat on the tug's bow and towed the port bow anchor toward the eastern shore. The port anchor, connected to the anchor buoy by a 50 foot pennant, trailed underneath the GREGORY while the tug proceeded toward the eastern shore. According to Captain Davenport, once the GREGORY's seven foot draft touched bottom, the anchor buoy and anchor were released. This procedure initially placed the port anchor outside of the navigable channel "up on the flats" on the eastern side of the river. The Weeks personnel aboard the dredge then tightened up on the port cable and the anchor moved west until it dug into the river bed. This procedure was repeated for the starboard (southern) anchor.

Both Captain Davenport and Daniel Mowers (Weeks project superintendent) testified that, set out in this manner, the southern bow anchor was located at least 20–25 feet east and 20–25 feet north of the 78 buoy.[1] The northern bow anchor was set approximately 300 feet north of the southern anchor, but approximately 50 feet closer in towards shore. Both of these anchors were positioned outside and east of the eastern boundary of the navigable channel, as marked by the 78 buoy. Moreover, the northern anchor, the anchor furthest east, was situated, at a minimum, 150–175 feet east of the *project channel* while the southern anchor was located approximately 120–125 feet east of the project channel. Based upon the consistent and thoroughly credible testimony of Captain Brown, plaintiff's expert, a licensed Hudson River tug pilot for nearly 19 years and presently a docking pilot for the Metropolitan Pilots' Association, as well as the Army Corps of Engineers chart and Iroquois Gas' overview drawing # WTX–HU–101, we find that due to shoaling east of the 78 buoy, both anchors were in relatively shallow water—approximately 15–20 feet.[2] Both anchors remained in the same position until the casualty.

We also credit the testimony of plaintiff's expert, naval architect Martin Levin, who, based upon data consistent with our foregoing findings regarding the placement of the bow anchors, calculated that the fourteen foot clearance point for the dredge's port bow anchor cable occurred approximately 300 feet from the western edge of the project channel. Accordingly, for vessels with a draft of 14 feet or greater, such as the CATHERINE, three quarters of the project channel was completely obstructed.

### (7)

## The Positioning and Movement of the WEEKS # 516 on October 15, 1991

Edward O'Donnell, the 11:00 p.m. to 7:00 a.m. shift superintendent, testified at his deposition that after his crew placed the dredge back to the position it had occupied prior to the casualty, he took a fix and determined the exact location of the dredge's bow.[3] This position, which he determined approximately

---

1. Although Mowers testified at trial that he recalled that the dredge's crane was used to set the bow anchors on the afternoon of October 14, 1991, he testified otherwise at his deposition in March 1993 and we thus find Captain Davenport's testimony to be the more credible on this point. More significantly, although Mowers' recollection of the method used to place the anchors differs from that of Captain Davenport, there is little difference in their accounts of *where* those anchors were placed.

2. We simply cannot credit Mr. Mowers' testimony—the only evidence offered by defendant to rebut plaintiff's contention regarding this issue—that the anchors were placed in water of depths exceeding 40 feet. Captain Brown offered unrebutted testimony that there are known flats and shoaling east of the 78 buoy and that the Army Corps of Engineers chart, which indicated the depths immediately east of the 78 buoy to be less than 25 feet, is the most current chart of the area. In addition, we note that in early 1991, the Coast Guard measured the depth of water below the 78 buoy at 24 feet—similar to the measurements contained on the Army Corps of Engineers chart (as Captain Brown confirmed). In light of the southern anchor's position approximately 20–25 feet east (i.e., toward shore) of the 78 buoy, we do not credit Mowers' contention that WEEKS # 516 placed the southern anchor in 40' of water.

3. O'Donnell testified that the incident did not cause the dredge to move further into the channel. [O'Donnell Dep. (Pltf's Ex. 23) at 103:20–104:19]. Johnson also testified that although the dredge swung south after the cable broke, the dredge's stern cables prevented the dredge from moving further into the channel. [Tr. at 792:12–21; 795:12–15].

one half hour after the casualty, was station 32 + 25. O'Donnell, reviewing the Iroquois Gas dredge prints given to Weeks to use during this operation, testified that station 32 + 25 is located 105 feet east of the project channel's western edge.

O'Donnell's testimony contradicted that of Blemaster and Johnson, namely, that the dredge was at position 9 + 60 at the time of the incident [4]—a position well outside of the project channel. We credit O'Donnell's testimony. The testimony of Mowers revealed that, during the 7:00 a.m.–3:00 p.m. shift, the dredge moved twice in order to backfill in three locations, thereby suggesting that the dredge—which could backfill only 30–40 feet before moving to a new position—would move forward approximately every 2–3 hours if it was engaged in continuous backfilling. It is undisputed that WEEKS # 516 backfilled continuously during the entire 3:00 p.m.—11:00 p.m. shift. We thus do not find it credible that, as Blemaster and Johnson assert, WEEKS # 516 moved only once during the latter shift. Rather, we credit O'Donnell's suggestion that the dredge made a second move during this shift, to 32 + 25.

(8)

Based on the foregoing findings, we find that at the time of the casualty WEEKS # 516 was located 105 feet east of the project channel's western edge, thereby. Its two bow anchor cables extended across the remaining portion of the navigable channel in a straight line from the dredge's bow to the two submerged anchors.

(9)

### WEEKS # 516's Procedures for Allowing Ships to Pass

O'Donnell testified that Weeks has no operations manual for operating dredges and has never issued to its personnel any written guidelines which could assist their employees in determining when to slacken anchor cables for approaching vessels. At all relevant times, there existed aboard the WEEKS 516 Mr. Mowers' "standing order" that the shift superintendent was to decide whether the dredge should slacken the anchor cables for a passing vessel. Evidence adduced at trial, however, revealed that during the 3:00 p.m.—11:00 p.m. shift, the crane operator and the mate would often make this decision.

Arthur Johnson, a mate on the WEEKS # 516, testified that in determining whether to slacken the cables, Weeks personnel considered only the dredge's proximity to the center of the channel and the draft of the oncoming vessel. No consideration was given to the amount of cable that was paid out, the weight of the anchor cable, the strength of the current, the size of the anchors or the tension on the cables.

We note that on October 15, 1991, the day of the casualty, the 7:00 a.m.—3:00 p.m. shift twice lowered the cables for passing vessels even though the dredge was not protruding as far into the channel as it was at the time of the casualty.

(10)

### The Upbound Transit of the CATHERINE and the NORTH STAR

On October 14, 1991, the day before the incident, the CATHERINE [5], Tug NORTH STAR ("NORTH STAR") [6] and their respective tows traveled northbound up the Hudson River en route to Rensselaer, New York. During their northbound transits, both units passed the WEEKS 516 which was engaged in backfilling operations just west of the navi-

---

4. We observe that Weeks personnel used two different measuring systems to record the dredge's location. One set of numbers were direct readings from the electronic measuring equipment, also known as EDM readings. The alternative method employed an adjusted reading referred to as a Del Norte reading. 32 + 25 is an EDM reading while 9 + 60 is a Del Norte reading.

5. Captain Fred Frabel was the captain of the CATHERINE at this time. Captain Frabel, a licensed master of Near Coastal Motor Vessels, had been employed by Turecamo as a captain since 1980.

6. Captain Paul Allen was the captain of the NORTH STAR, a 100 foot twin screw 2,300 horsepower tug, which is owned and operated by Spentonbush Red Star. Captain Allen is a licensed master of Near Coastal Motor Vessels and has been employed as tug captain with Spentonbush Red Star since 1976.

gable channel. The dredge's bow anchor cables extended across the navigable channel to the anchors which had been set earlier that day, as described above.

During the NORTH STAR's upbound transit, the NORTH STAR was towing a loaded tank barge which had a draft of 17–18 feet. As the NORTH STAR approached the dredge, the dredge contacted the NORTH STAR and inquired as to the unit's direction and the draft of the barge. Captain Allen of the North Star informed the dredge that his loaded barge drew 17½ feet. The dredge advised the NORTH STAR that its anchor buoys were on the eastern side of the channel, and that due to the barge's draft, the cables would have to be lowered. WEEKS # 516 subsequently slackened the cables.

During their upbound transits, both the CATHERINE, NORTH STAR and their respective tows passed by the WEEKS 516 without incident.

### (11)

### The Events of October 15, 1991: The Downbound Transit of the CATHERINE and the NORTH STAR

At approximately 7:50 p.m. on October 15, 1991, the CATHERINE towing the empty tank barge B. No. 45 ("B–45") [7], owned by Bouchard Transportation Company, Inc. ("Bouchard"), departed the Agway Terminal in Rensselaer, New York and proceeded south on the Hudson River towards New York Harbor. When the tug and tow departed the Agway Terminal, Captain Frabel was on duty, along with Engineer Joe LeBreton and Deckhand Roland Hellengreen. Captain Frabel and Deckhand Roland Hellengreen testified that Captain Frabel was in the wheelhouse navigating the unit southbound by means of the center steering controls. Hellengreen, serving as lookout, sat on the settee located in the tug's wheelhouse. LeBreton remained below in the engine room, while the tug's other two crew members, the tug's mate and the other deckhand, were below in their quarters. During the downbound transit, Captain Frabel utilized his Furuno radar, and was monitoring channel

13 (the bridge to bridge channel) and channel 18a (Turecamo's house channel) on the tug's two VHF radios.

In the vicinity of Fitch's Wharf, Captain Allen located the CATHERINE and B–45 on the NORTH STAR's radar. At that time the NORTH STAR, towing the empty tank barge ETHEL H ("ETHEL H"), was proceeding southbound at approximately 8 knots. Captain Allen estimated that the CATHERINE and B–45 were approximately one mile behind the barge he was towing. As the more powerful and faster CATHERINE and B–45 began to near the NORTH STAR and ETHEL H, and Captain Frabel and Hellengreen saw the large outline of the ETHEL H's stern and her stern light, Captain Frabel slowly reduced speed and fell in line behind the NORTH STAR and ETHEL H. The CATHERINE closed to within 1500–1750 feet behind the ETHEL H's stern and then further reduced speed to a little more than dead slow, thereby matching the speed over the ground that the NORTH STAR and her tow were travelling.

Captain Frabel testified that, based on his recent transits through this area, he knew that the WEEKS 516 was performing dredging operations just south of Middle Ground Flats and had requested advance notice of a vessel's approach. Hence, at approximately 10:00 p.m., while the two units were just south of an area known as Four Mile Point, Captain Frabel attempted to contact the WEEKS 516 on channel 13 to advise the dredge that the units would be passing within 20 minutes.

The GREGORY, which was traveling to shore to pick up the 11:00 p.m.—7:00 a.m. crew and monitoring channel 13, responded to Captain Frabel's call. Captain Frabel advised the GREGORY that his tug was towing a "light barge on a short wire", that his tug and tow were the second of two units proceeding southbound, and that the CATHERINE's draft was 14 feet. According to Captain Frabel, the GREGORY responded by instructing him "to hug the red [or left, or east] side of the channel and you won't have

---

7. The B–45 is a steel tank barge with bow and stern rakes, 10 cargo compartments and dimen-

sions of 300 feet × 64 feet × 21.5 feet molded depth. [Stip.Fact No. 32].

any trouble." Captain Allen, monitoring this call, averred that the GREGORY advised Captain Frabel that the anchor buoys were in the same place as they were the night before and instructed the CATHERINE to "stay on the eastern side of the channel and you boys will have no problems."

Shortly thereafter, Captain Allen called the WEEKS 516 and stated: "This is the NORTH STAR, I am towing a light barge. I will be the first one you meet and I am drawing 14½ feet." The GREGORY gave the NORTH STAR identical passing instructions. Captains Frabel and Allen each testified that they interpreted Weeks' instructions to mean that sufficient clearance existed on the east side of the navigable channel for their respective units to safely pass over the dredge's bow anchor cables.

WEEKS # 516 did not attempt to take any action to move out of the channel and did not slacken its bow anchor cables. On the dredge, Weeks' personnel prepared for the upcoming crew change. According to Johnson, by 10:10 p.m. some of the crew members had already begun washing up and getting ready for change of shift.

Captain Allen testified that, at approximately 10:15 p.m., as the NORTH STAR passed the Hudson Boat Basin near the 79 buoy, he first sighted the WEEKS # 516, observing that the dredge was situated within the channel, on the west side. The dredge was well lit by its bright flood lights. Captain Frabel testified that he sighted the WEEKS # 516 a minute or two later, as the CATHERINE passed the 79 buoy.

The Hudson River, from the 79 buoy south to Hudson Light, bends gradually to the right. Accordingly, as the units passed the 79 buoy they each had to make a gradual turn towards starboard to remain within the channel. However, because of the presence of the WEEKS 516 on the west side of the channel, Captain Allen had the NORTH STAR and her tow take a wide berth toward the east side of the channel through the bend. Captain Frabel testified that, in attempting to follow the NORTH STAR and her tow, the CATHERINE did likewise.

The Hudson River south from Hudson Light to the 78 buoy the channel is virtually straight. Vessels proceeding from Hudson Light towards the 78 buoy generally favor the west side of the channel to avoid the known mud flats and shoaling east of the 78 buoy. Captain Allen testified, however, that due to the presence of the WEEKS 516 on the west side of the channel, the NORTH STAR and her tow were forced to favor the east side of the channel. Captain Allen testified that as the NORTH STAR and her tow approached the WEEKS 516, both his own visual scan of the river and his radar indicated that the CATHERINE and her tow remained approximately one-quarter of a mile directly astern of the NORTH STAR.[8]

Captain Allen testified that, in accord with the GREGORY's instructions, he steered the NORTH STAR along what he believed to be the navigable channel's east edge. Captain Allen testified that the NORTH STAR came within 50 feet of the southern anchor buoy. As a consequence of this extreme eastward position, Captain Allen stated that he had to alter his course to starboard in order to pass on the channel side of the 78 buoy.

(12)

### The Navigation of the CATHERINE

Captain Frabel testified at trial that he sought to follow the NORTH STAR's path as the two units approached the dredge site. His trial testimony, however, also indicated that during its approach toward the WEEKS # 516, the CATHERINE failed to utilize numerous aids of navigation available to her. More precisely, Captain Frabel stated that he was aware that the cables ran to anchors marked by anchor buoys east of the ship channel, but he nonetheless did not look for the anchor buoys visually or on radar. Nor did the CATHERINE utilize her 1000 watt searchlight to locate the anchor buoys. In addition, although Captain Frabel knew that if the CATHERINE utilized her radar she would be able to observe the red flashing 78 buoy and the 76 buoy marking the east side of the navigable channel, he did not employ

---

**8.** We discuss the position of the CATHERINE prior to and during the casualty, and our find- ings with respect to that issue, more fully *infra* at 1225–1226.

the radar for that purpose or even attempt to sight these channel markers visually. The CATHERINE did not use her radar for any purpose—to determine her distance off Hudson Light upon her passage of that point; to locate WEEKS #516; or to locate the red flashing 78 buoy or the 76 buoy which mark the easterly channel line. Finally, Captain Frabel did not steer courses or utilize the CATHERINE's gyro or magnetic compass for any purpose.

Rather, Captain Frabel averred that he relied on his local knowledge (accrued during nearly 500 navigations of the Hudson River) and certain visual aids—including the eastern shore, the power stanchions located thereon, and the 78 buoy—to take visual distances that (to his mind) confirmed that the CATHERINE was maintaining a course on the east side of the channel as he attempted to pass the dredge.

### (13)

### The Sequence of Events During the Actual Allision

Captain Frabel testified that as the CATHERINE came abeam of the WEEKS 516, he suddenly saw (while looking over the tug's starboard bow) a taut, horizontal cable leading off the WEEKS 516's port bow and entering the water only 50–75 feet from the CATHERINE. It was readily apparent to Captain Frabel that there was not going to be sufficient clearance for the CATHERINE to pass over the cable, and he told Hellengreen: "I don't think we're going to make it." Captain Frabel immediately reduced speed to dead slow, but in the hope of clearing the cable, he intentionally kept his engines engaged. Hellengreen testified that, a few seconds later, the CATHERINE snagged the anchor cable, causing the tug to come to an abrupt stop. Captain Frabel promptly sounded the tug's alarm and ordered Hellengreen below to warn the other crew members of the imminent collision with her barge, B–45.

Seconds after the CATHERINE snagged the dredge's anchor cable, the B–45 struck and overrode the tug's stern, causing the tug's bow to rise and the stern to fall. Captain Frabel and Hellengreen testified that

the B–45's bow came to rest against the CATHERINE's aft steering station, otherwise known as the doghouse. Water began pouring over the tug's stern and reached as far forward as the engine room's aft doorways. The engineer and the other deckhand were able to secure these doors before the water could flood the engine room. The engineer then gathered life jackets and survival gear and placed them in the tug's galley in case the crew was ordered over the side. Captain Frabel testified that at that time, he believed that the CATHERINE was going to be "sucked down" and he was prepared to order the crew to abandon ship.

A few seconds later, however, the port bow anchor cable snapped, causing the CATHERINE to shoot out from under the barge in a westerly direction. The CATHERINE continued moving in a westerly direction for approximately 100 feet before Captain Frabel could regain control of the vessel and steer in a southerly direction.

Blemaster testified that due to the combined effects of the broken anchor cable and the ebb tide, the WEEKS 516 drifted south in the direction of the overhead power wires. Although the WEEKS 516 swung south, the dredge's stern cables kept the dredge from moving further east into the channel. Although the CATHERINE and her tow moved west in the direction of the dredge, the tug did not collide with the dredge and at no time was Captain Frabel or any of the Weeks crew members concerned that a collision would occur.

Once he had the CATHERINE back under control, Captain Frabel made numerous unanswered calls to the WEEKS 516 to find out why Weeks had "tightened the wire." Eventually, Blemaster responded to Captain Frabel's repeated calls and inquired whether everyone aboard the CATHERINE was okay. After confirming that everyone was okay, Captain Frabel again inquired why the dredge did not provide sufficient clearance for his unit to pass. Blemaster ignored the inquiry and told Captain Frabel to proceed on with his downbound transit.

Captain Frabel testified that after the incident had taken place, during the remainder of the CATHERINE's transit to New York

Harbor, the crew members felt vessel vibrations which they had not experienced prior to the incident. In spite of these vibrations, the tug's crew was able to navigate the remainder of the trip without further incident. On the morning of October 16, 1991, the CATHERINE and B–45 met the tug ELIZABETH TURECAMO ("ELIZABETH") off the World Trade Center. The ELIZABETH relieved the CATHERINE and took the B–45 to Caddell's Shipyard in Staten Island. The CATHERINE proceeded to Pier 5 in Staten Island where divers examined the tug's hull for damage.

(14)

## The Position of the CATHERINE Immediately Before and During the Casualty

Turecamo presented evidence intended to establish that the CATHERINE complied with the GREGORY's instruction to favor the eastern side of the channel. During his deposition, Captain Allen averred that the CATHERINE was directly astern of his tow when his unit began to pass the WEEKS 516. Captain Frabel and First Mate Hellengreen testified that Captain Frabel, using the ETHEL H's stern light, as well as the NORTH STAR's and her tow's quick water, was following directly behind Captain Allen's unit as he navigated past the dredge. Both men estimated that the CATHERINE was approximately 200 feet away from the dredge when it snagged the cable. In light of our finding *supra* that the dredge was 105 feet into the channel, this testimony places the CATHERINE's starboard side 300 feet from the project channel's western side, and (accounting for the CATHERINE's width of 30 feet), places the CATHERINE's port side approximately 70 feet from the east side of the project channel. Accordingly, the B–45, which significantly exceeded the size of the tug, would have been even closer to the project channel's eastern edge. Situated in this position, the CATHERINE would have been in compliance with the GREGORY's instruction.

In support of its contention that the CATHERINE was on the west side of the channel when it snagged the cable, Weeks presented the testimony of Blemaster and Johnson, who testified that at the time the CATHERINE made contact with the dredge's anchor cable the tug was between 70 feet (Blemaster) and 100 feet (Johnson) off the bow of the WEEKS # 516. Several factors, however, persuade us that this testimony is not credible. First, at the time the CATHERINE made its final approach toward the dredge, neither Blemaster nor Johnson was out on deck. Blemaster was in his office and Johnson was in the mate's shack changing his clothes. Second, Johnson conceded that when he first saw the CATHERINE and the NORTH STAR approach, the CATHERINE was directly astern of the NORTH STAR. Johnson conceded, however, that his view was obstructed at the time of the casualty [9] and that he was peering into darkness from a well-lit dredge. Nor, despite alleged proximity of the CATHERINE to the dredge, could Johnson recall any other relevant distances or estimate the size of the CATHERINE or its tow.

Moreover, as the CATHERINE made her final approach (allegedly within 100 feet of the dredge), trial testimony indicated that no warnings were given aboard the WEEKS 516 and no one appeared alarmed. According to Johnson, it was only right before the CATHERINE snagged the cable, when "it was too late to do anything," that he noticed that the CATHERINE was within 100 feet of the dredge and that it was going to snag the cable. Johnson and Blemaster also testified that although the CATHERINE was within 70 feet of the dredge when the tug snagged the cable, at no time were they ever concerned that the CATHERINE or its 300 foot × 60 foot barge would collide with the dredge.

The foregoing testimony of Johnson and Blemaster with respect to the position of the CATHERINE at the time of the casualty is simply inconsistent with their own testimony, and that of others, concerning the sequence

---

**9.** Johnson testified that when in the mate's shack, located 80 feet from the dredge's bow, the

crane obstructs the view of the dredge's bow.

of events during and after the CATHERINE's contact with the anchor cable. According to both Captain Frabel, and Blemaster himself, after the cable snapped, the CATHERINE shot out from under the barge at a 90 degree turn to starboard, in a westerly direction, for approximately 100 feet before Captain Frabel was able to gain control of his unit. If, in fact, the CATHERINE had been only 70 feet from the dredge when this incident occurred, both Johnson and Blemaster would have certainly felt that a collision was imminent when the CATHERINE shot out from under the barge and headed in the direction of the WEEKS 516.

In light of the foregoing, we find that the CATHERINE attempted to comply with the GREGORY's instruction, and, in doing so, had by the time of the casualty steered somewhere between 100 and 200 feet from the WEEKS # 516. We find, however, that although there is evidence that the CATHERINE slowed, it nonetheless maintained a course and speed that enabled it (in Captain Frabel's view) to pursue the path tracked by the North Star.

### (15)

### Causes of the Allision

██ The Court finds that the protrusion of the WEEKS # 516 into the navigable channel and its failure to slacken its bow anchor cables upon the approach of the NORTH STAR and CATHERINE constituted hazards which partly caused the allision. The Court also finds that the failure of the CATHERINE to utilize all of its navigational aids and further slow down to accommodate clear and separate passage partly contributed to the allision. The Court attributes 66⅔% of the fault to the WEEKS # 516 and 33⅓% of the fault to the CATHERINE.

### (16)

### Damage to the B–45

On the day following the accident, Turecamo placed Weeks on notice that Turecamo intended to hold Weeks liable for all damages Turecamo would incur as a result of the casualty. In response, Weeks denied any liability and advised Turecamo that the company was holding Turecamo liable for damage to the WEEKS # 516 incurred as a consequence of the incident. James Newman, a vice-president of Turecamo, and Peter Austen, Risk Manager for Bouchard, testified that shortly thereafter, Bouchard placed Turecamo on notice for all of their damages associated with this incident.

On October 18, 1991, a joint survey of the B–45 occurred at the Caddell Shipyard in Staten Island, New York, while the barge was lying in drydock. Newman testified at trial that Norman C. Jensen attended the joint survey on behalf of Turecamo's underwriters' interests, while other parties in attendance included Johan P. Van Grieken—representing Bouchard's underwriters; Robert Massa—representing Caddell Drydock & Repair Company; Robert Bouchard, Jr.—representing Bouchard's interests; and George Wittich—representing Weeks' interests. Testimony at trial established that the surveyors discovered damage to the barge's bow rake, damage to the barge's bottom plating (areas of which had been pushed in significantly), and internal structural damage above the damaged bottom plates. Austen testified that the surveyors, with the exception of Mr. Wittich [10], determined that due to the nature of this damage the barge was not seaworthy. Accordingly, Austen testified at trial, the barge was taken out of service so that immediate repairs could be made. With the exception of Wittich, the surveyors involved in the joint survey were of the opinion that all of the damages noted were reasonably attributable to the Weeks incident.

Both Newman and Austen testified that Bouchard's total damages included:

| | |
|---|---|
| Repairs to the B–45: | $ 84,800.00 |
| Tank cleaning and gas freeing of the barge prior to the commencement of work: | $ 17,125.00 |
| Towing expenses associated with placing the B–45 in and out of drydock: | $ 2,606.75 |
| Survey charges: | $ 3,404.00 |
| Loss of hire of the B–45 for 232.5 hours | $58,125.00 |
| Total Amount of Damages: | $166,060.75 |

10. Mr. Wittich signed the surveyors' report "in attendance only."

Jensen testified that, again with the exception of Wittich, the surveyors considered the price for repairs to the B–45, and the additional costs associated with those repairs, to be fair and reasonable. The repairs commenced on October 18, 1991 and were completed on October 25, 1991.

With respect to the detention charges for the B–45, Newman testified that Bouchard provided Turecamo with daily reports and barge utilization records of Bouchard's two other 60,000 bbls. clean barges indicating that these barges were fully utilized during the ten-day period when the B–45 was out of service.[11]

Newman and Austen testified that Turecamo subsequently entered into negotiations with Bouchard and later settled with Bouchard in the amount of $153,482.50—a 92% settlement of Bouchard's claim. The terms of the settlement provided that, in exchange for the tender of the settlement proceeds, Bouchard released Turecamo from all claims that Bouchard had against Turecamo in regard to the casualty, and also assigned to Turecamo all of its legal rights, claims and remedies which Bouchard had against Weeks. The terms of the settlement were memorialized in a written release which was subsequently executed by Bouchard's President, Mr. Morton Bouchard, on August 5, 1992.

### (17)

### Damage to the CATHERINE

Newman and Jensen testified that a joint survey of the CATHERINE was conducted on October 30, 1991 at the May Shipyard in Staten Island, New York. Al Urquhart attended on behalf of Turecamo's interests. Jensen attended the survey on behalf of Turecamo's underwriters. Other individuals in attendance included: Wittich, representing Weeks, and Mohamed Adam, representing May Ship Repair Construction Corporation.

■ The surveyors found damage to the CATHERINE's stern, aft steering station, aft mast, starboard rudder and the starboard and port propellers. All surveyors in attendance, with the exception of Mr. Wittich, were of the opinion that all of the damages observed, including the damage to the propellers, were reasonably attributable to the Weeks incident. We so find.[12] The surveyors determined that the tug's port propeller could be repaired. Jensen and Newman testified, however, that the American Bureau of Shipping ("ABS") surveyor condemned the starboard propeller and instructed that it be replaced. Due to the length of time in obtaining a new starboard propeller, Turecamo, with ABS' approval, elected to perform temporary repairs on the starboard propeller in order that the CATHERINE could be put back in service while awaiting the new starboard propeller which would be installed at a later date.

Initially, the temporary repairs to the starboard propeller and the permanent repairs to the port propeller were scheduled to be performed at O & M Propeller Reconditioning Co. The attending ABS surveyor, however, declared O & M's welding procedures inade-

11. At trial, plaintiff's counsel and Turecamo were unable to locate the utilization records of one of Bouchard's other 60,000 bbls. clean barges, the B–85, but Austen and Newman both testified that the B–85 records were provided to Turecamo, and Austen testified that he referred to the B–85 records in calculating Bouchard's loss of profits.

12. At trial Weeks contested primarily the damage to the CATHERINE's doghouse and her propellers. With regard to the doghouse, eyewitness testimony regarding the casualty (including that of both Captain Frabel and Hellengreen) compels us to find that the barge struck the doghouse, thereby causing the damage catalogued by the surveyors. In respect to the propellers, Weeks argued at trial, based on the testimony of Wittich, that the scoring and fracture damage observed was not caused by this casualty, but rather by a grounding of the CATHERINE alleged to have occurred one week earlier. We note that Weeks offered no evidence at trial that this grounding actually occurred or, if such an incident took place, the extent of the damage to the CATHERINE. More significantly, the underwriter's surveyor, Jensen, testified that the damage observed on the propellers was not consistent with a grounding. Specifically, he stated that a grounding would result in denting and bending of the propeller blades, whereas the CATHERINE's propellers exhibited scoring and stress fractures. We credit Jensen's testimony, and find that the damage to the CATHERINE's propellers resulted from the allision with the WEEKS # 516.

quate, and the repairs were instead performed at Ferguson Propeller & Reconditioning Ltd, Hoboken, New Jersey. All of the repairs were completed by November 21, 1991, at which time the tug was taken off drydock on that date and placed back in service. At a later date, the CATHERINE returned to drydock and was fitted with a new starboard propeller.

The total cost to Turecamo of repairs to the CATHERINE and associated expenses were as follows:

| | |
|---|---|
| Repairs to the CATHERINE performed at May Shipyard: | $33,806.00 |
| Initial work performed at O & M Propeller: | $ 650.00 |
| Repairs performed at Ferguson Propeller (permanent repairs to port propeller and temporary repairs to starboard propeller): | $25,315.00 |
| Cost of new starboard propeller manufactured at Avondale Industries: | $20,930.00 |
| Surveyors' and divers' fees: | $ 3,470.00 |
| Trucking involved in transporting the new starboard propeller from Avondale Industries in Mississippi to May Shipyard in Staten Island, New York: | $ 269.80 |
| Total Amount: | $84,440.80 |

Jensen testified that, with the exception of Wittich, all of the individuals in attendance at the joint survey determined that this price was fair and reasonable.[13] We credit this testimony.

Newman testified that, as a result of the casualty, the CATHERINE was out of service during the following time periods: October 29, 1991, 12:01 a.m.–5:30 a.m. and 9:30 a.m.–12:00 a.m., for a total of 18 hours and 30 minutes; October 30, 1991–November 21, 1991, for a total of 23 days; and, November 22, 1991, 12:01 a.m.–10:00 p.m., for a total of 10 hours and 40 minutes. The total amount of time which the CATHERINE was out of service was 24 days, 5 hours and 10 minutes. Newman also testified that, during this same time period, Turecamo's remaining similar

size tug boats (4,000 hpr tugs) were 95% utilized, and that, if the CATHERINE had been available during this busy time period she would have been utilized to the same extent. Based upon the CATHERINE's profit analysis for the months of October, November and December 1993, Newman offered unrefuted testimony at trial that the average gross revenue that the CATHERINE made during each of these three months was $165,000.00.[14] After deducting the tug's operating expenses, the net revenue totalled approximately $105,000.00. Recognizing the CATHERINE was out of service approximately 80% of the month, Newman multiplied this percentage by the $105,000 figure. Multiplying the 95% utilization rate by this new amount, we conclude that the loss of CATHERINE's service resulted in a net income loss of $80,000.00.

(18)

## Damage to the WEEKS # 516

Weeks asserts a counterclaim in the amount of $14,260.08 representing the costs associated with the anchor cable damaged in this incident. By letter dated March 9, 1992, Weeks informed Turecamo of its intention to hold Turecamo liable for all damages to the WEEKS # 516 as a result of the casualty. A copy of the repair invoice was appended to the March 9, 1992 letter. At trial, Turecamo presented no evidence to dispute the reasonableness of these repairs and related expenses.

## DISCUSSION

### *Liability*

### Standard of Care in Maritime Allision Actions

■ The Inland Navigation Rules and common law principles of admiralty law require prudent seamanship and the exercise of reasonable care in the navigation of a seagoing vessel. *E.g., Williamson Leasing Com-*

---

**13.** Weeks presented no evidence at trial to refute the surveyors' conclusion.

**14.** Newman also testified that Turecamo did not maintain these types of records in 1991 and he

therefore used the 1993 records. He also confirmed that 1991 and 1993 were comparable years.

*pany v. American Commercial Lines, Inc.,* 616 F.Supp. 1330, 1338 (E.D.La.1985). Violation of the rules of navigation or default in the exercise of prudent seamanship constitute negligence and impose liability on the guilty party, just as is the case in a common law negligence action. *Diesel Tanker Ira S. Bushey, Inc. et al. v. Tug Bruce A. McAllister,* 1994 WL 320328, at *6–7, 1994 U.S.Dist. LEXIS 8788 *22 (S.D.N.Y.1994) (Mag. J. Katz). Maritime collision liability is predicated upon such a finding of fault (i.e., a finding of negligent conduct) and the mere fact of physical impact has no legal consequence. *The JAVA,* 81 U.S. (14 Wall.) 189, 190, 20 L.Ed. 834 (1872); *Hogge v. SS YORKMAR,* 434 F.Supp. 715, 727 (D.Md. 1977); *Williamson, supra,* 616 F.Supp. at 1341. The fault, moreover, must be a contributing cause of the collision for liability to be imposed. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873).

For the reasons set forth below, we conclude that each party to this action was at fault and such faults were contributing, legal causes of the allision between the CATHERINE and WEEKS # 516 on October 15, 1991 and the damages incurred thereby. Accordingly, we assess damages in a ratio consistent with our findings of fact, namely, that plaintiff bears a 33⅓ proportional fault and defendant a 66⅔ proportional fault. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (in collision cases the court must apportion liability among the parties proportionately to the comparative degree of their fault); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware,* 661 F.2d 1044, 1057 (5th Cir.1981) (in collision cases where both parties are at fault, the court should assess damages in whatever ratio it deems appropriate).

### The Inland Navigation Rules ("INR")

The Inland Navigation Rules encompass long-standing steering and sailing rules and principles, otherwise known as "Rules of the Road", which govern navigation on inland waters. *Kerman v. American Dredging Co.,*

355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). These rules have existed in various forms over the years, the latest version representing a unification of rules and related regulations which were codified by the Inland Navigational Rules Act of 1980, 33 U.S.C. §§ 2001 through 2073.

■ These Congressionally sanctioned rules of navigation designed to prevent collision are based upon the fundamental principle that the vessel better able to control her movements should give way to a less able vessel. *Thorp v. Harmond,* 79 U.S. (12 Wall.) 408, 20 L.Ed. 419 (1871). Indeed, anyone who undertakes operation of vessels on navigable waters is charged with knowledge of the INR and a mandatory duty to obey them. *Allen v. State,* 39 Md.App. 686, 389 A.2d 909 (1978).

### The Pennsylvania Rule

■ The Pennsylvania Rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, "the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The PENNSYLVANIA, supra.* While the Pennsylvania Rule does not *ipso facto* impose liability, it shifts the burden of proof as to causation and imposes a presumption of fault on the party to whom it applies. *E.g., Otto Candies, Inc. v. M/V MADELINE D,* 721 F.2d 1034, 1036 (5th Cir.1983); *First National Bank v. Material Service,* 597 F.2d 1110 (7th Cir.1979). As we explain below, the Pennsylvania Rule applies to both plaintiff and defendant in this action.

### Defendant's Statutory Violations

■ The Rivers and Harbors Act, 33 U.S.C. § 409 provides in relevant part:

It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft.... [15]

---

**15.** The WEEKS # 516 constitutes a vessel within the meaning of 33 U.S.C. § 409 and within the meaning of 33 U.S.C. § 2009(g). *United States v. Moran Towing and Transportation Company,* 374

F.2d 656 (4th Cir.1967); *United States v. Chesapeake and Delaware Shipyard, Inc.,* 369 F.Supp. 714 (D.Md.1974).

In determining whether an anchoring constitutes an obstruction to navigation, we evaluate all the relevant facts, considering especially the percentage of the waterway's width which is not obstructed. *Williamson, supra,* 616 F.Supp. at 1338. We note that a vessel need not completely obstruct the channel in order to violate § 409. Rather, if an anchored vessel "occupies so much of the navigable channel as to practically impede [another vessel's navigation] or make the effort to pass a "dangerous maneuver," she has placed herself in a position which the statute [33 U.S.C. § 409] forbids, and must take the consequences of her unlawful act. *Strathleven Steamship Company v. Baulch,* 244 F. 412, 414 (4th Cir.1917).

◼ Here, our findings of fact include that the WEEKS # 516 extended 105 feet into the project channel—fully 25% of the project channel's total width—at the time of the casualty. We find, moreover, that the placement of the dredge's bow anchors in shallow water east of the 78 buoy resulted in clearance of the anchor cables (in an unslackened state) for passing vessels with a 14 foot draft or greater at approximately 300 feet from the western edge of the project channel, which left only 25% of the channel unobstructed. Such a substantial obstruction of the channel clearly violates § 409. *Williamson, supra,* 616 F.Supp. at 1338; *Manhattan Lighterage Corp. v. United States,* 103 F.Supp. 274, 276–277 (S.D.N.Y.1951); *The Hokendauqua,* 270 F. 270 (E.D.N.Y.1919), *aff'd* 270 F. 273 (2d Cir.1920); *Orange Beach Water, Sewer and Fire Protection v. M/V ALVA,* 680 F.2d 1374, 1379–1380 (11th Cir. 1982); *Jacksonville Shipyards, Inc. v. A Vessel Hong Kong Clipper,* 309 F.Supp. 1196, 1200–1201 (D.S.C.1970), *aff'd in part and rev'd on other grounds,* 442 F.2d 450 (4th Cir.1971). Accordingly, the Pennsylvania Rule applies to defendant Weeks in this action.[16]

### Defendant's Negligence

◼ We find additionally that Weeks personnel acted negligently in failing to slacken the WEEKS # 516 as the NORTH STAR and CATHERINE attempted to pass the dredge, independent of any statutory violations flowing from such action. First, as noted *supra* at 10, despite having operated dredges for a number of years, Weeks lacks an operations manual for dredges and has issued no written guidelines to its employees relating to decisions to slacken anchor cables for approaching vessels. Second, in making such determinations, Weeks personnel employed inadequate criteria, focusing solely on the dredge's proximity to the *center* of the channel and the draft of the approaching vessel rather than considering such factors as the amount of cable that was paid out, the weight of the anchor cable, the strength of the current, the size of the anchors or the tension on the cables. Third, and most significant, the 7:00 a.m.—3:00 p.m. shift on the WEEKS # 516 had twice slackened the cables earlier on October 15, 1991 even though, at those times, the dredge did not protrude as far into the project channel as it did at the time of the casualty. Finally, the evidence presented at trial, including the undisputed facts that at the time that the CATHERINE initially contacted the WEEKS # 516 the GREGORY had already been dispatched to pick up the 11:00 p.m.–7:00 a.m. dredge crew and (as Johnson testified) that if the 3:00 p.m.–11:00 p.m. crew had slackened the anchor cables then that crew would have had to remain on duty to put the dredge back on line, supports the inference that the imminent crew change on the WEEKS # 516 contributed to the decision not to slacken the anchor cable and, consequently, to the casualty. The foregoing circumstances persuade us that Weeks and its personnel did not exercise reasonable care in deciding not to slacken the anchor cables to allow the

16. Weeks urges that the NORTH STAR's safe passing of the dredge militates against application of § 409 to Weeks' conduct. We disagree. That other vessels have managed to navigate an obstructed channel does not resolve the issue of whether § 409 applies to an anchoring vessel's conduct. *See Williamson, supra,* 616 F.Supp. at 1338 (holding that plaintiff's vessel obstructed

channel under § 409 despite safe passage of vessel other than that involved in allision); *The Caldy,* 153 F. 837, 839, 840 (4th Cir.1907) (explaining that safe passage of other vessels "may show that the position of the [unlawfully anchored vessel] did not prevent the passage of other vessels; but it did not establish that it did not obstruct the passage of vessels and craft").

NORTH STAR and the CATHERINE to pass the dredge on October 15, 1991. Accordingly, Weeks is also subject to liability on a theory of pure common law negligence, separate and apart from the above discussed statutory violation. *Manhattan Lighterage Corp., supra,* 103 F.Supp. at 277.

### Plaintiff's Statutory and Regulatory Violations

### Burden of Proof on Moving Vessels

It is well settled that a moving vessel which strikes a stationary vessel at anchor is presumed to be at fault and has the burden of proving otherwise. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Mount Washington Tanker Co. v. Wahyuen Shipping, Inc.,* 833 F.2d 1541 (11th Cir.1987); *Self Towing, Inc. v. Brown Marine Services, Inc.,* 837 F.2d 1501 (11th Cir. 1988). A vessel in motion is presumed to have control over her movements, imposing upon such vessel a duty to avoid vessels at anchor. Consequently, there exists a presumption of fault against a moving vessel where she collides with a vessel anchored in proper place with requisite lights. *The S.S. Randa,* 56 F.Supp. 508 (D.C.N.Y.1944); *The Marshall O. Wells,* 172 F. 984 (D.C.N.J.), aff'd, 178 F. 918 (3rd Cir.1910). This presumption suffices to make a prima facie case of negligence. *See, e.g., Skidmore v. Grueninger,* 506 F.2d 716, 722 (5th Cir.1975); *Williamson Leasing Company, Inc. v. American Commercial Lines, Inc.,* 616 F.Supp. 1330, 1339 (D.C.La.1985).

The presumption against moving vessels is bolstered by INR # 18, 33 U.S.C.S. § 2018 which provides: "A power-driven vessel underway shall keep out of the way of . . . a vessel restricted in her ability to maneuver." 33 U.S.C.S. § 2018(a)(ii). The term "power-driven vessel" is defined as any vessel propelled by machinery. 33 U.S.C.S. § 2003(b). The CATHERINE was so propelled. A "vessel restricted in her ability to maneuver" is defined as a vessel which from the nature of her work is restricted in her

ability to maneuver and is therefore unable to keep out of the way of another vessel. 33 U.S.C.S. § 2003(g). Vessels in this category include vessels engaged in dredging operations, 33 U.S.C.S. § 2003(g)(ii), as well as vessels engaged in a towing operation which severely restricts the towing vessel and her tow in their ability to deviate from their course, 33 U.S.C.S. § 2003(g)(vi). It is clear the WEEKS # 516 was lawfully engaged in dredging at the time of the collision and was a vessel restricted in her ability to maneuver. It is also plainly evident that the CATHERINE was not restricted under the § 2003(g)(vi) definition since she was engaged in a routine tow of the B–45 barge and no evidence was presented demonstrating that such towing operation severely restricted the CATHERINE's maneuverability.[17] Accordingly, the CATHERINE, as a power-driven vessel was under a duty to keep out of the way of WEEKS # 516 and her failure to do so constitutes a violation of 33 U.S.C.A. § 2018. As detailed below, Turecamo was unable to rebut this presumption at trial and is, accordingly, found to be proportionately at fault for the casualty.

More precisely, Inland Navigation Rule 7 governing the risk of collision, provides:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty-radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account: (i) such

---

**17.** Pursuant to INR # 27(b), 33 U.S.C.S. § 2027(b), a vessel restricted in her ability to maneuver is required to exhibit appropriate lighting to indicate her condition. The fact that

the CATHERINE failed to display the requisite lighting indicates that Captain Frabel did not consider the CATHERINE to be so restricted.

risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change; and (ii) such risk may sometimes exist even when an appreciable bearing change is evident particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

"A vessel equipped with radar is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision. The failure of an operator of a vessel to detect, by radar, that a close quarters situation is developing and the subsequent failure to take early and substantial action to avoid such a situation is statutory fault." *Williamson, supra*, 616 F.Supp. at 1340. Substantial evidence at trial, including the testimony of Captain Frabel himself, established that the CATHERINE did not employ radar, her searchlight, or any other navigational tool in traversing the channel. Use of such equipment would have revealed the exact location of the 78 buoy and the 76 buoy marking the east side of the channel, or the distance of the CATHERINE from the eastern shore. This violation of Inland Navigation Rule 7 results in the application of the Pennsylvania rule to Turecamo as well.

### Weeks' Other Assertions of Statutory Fault

■ We decline to credit Weeks' remaining assertions of statutory violations by the CATHERINE that allegedly contributed to the casualty, namely, that Captain Frabel failed to post a proper lookout on the downbound transit and that he failed to stop the CATHERINE's engines prior to her passing over the dredge's bow cables. First, we find that Weeks has not by the submission of additional evidence or by means of cross-examination rebutted Hellengreen's testimony, which was entirely consistent with Captain Frabel's account of the downbound transit, i.e., that he served as a proper lookout stationed on the settee located in the aft section of the wheel. Upon reviewing Hellengreen's testimony, Captain Brown testified that Hellengreen had served as a proper lookout. We note, moreover, that the unre-

butted evidence presented at trial also establishes that Captain Frabel retained an unobstructed view of the waters ahead of the CATHERINE as he attempted to navigate past the dredge. In such a circumstance, the absence of a lookout is immaterial. *See, e.g., Bindloss v. Blue Fin*, 137 F.Supp. 827, 829 (D.R.I.1955) (finding captain of tug to be a sufficient lookout where it was unlikely that a lookout, if posted, would have been able to observe anything that the captain could not see).

■ Second, we decline to adopt the position of Weeks' expert, Frank Cowan, that Captain Frabel's failure to stop the CATHERINE's engines upon sighting the cable constituted statutory fault. Captain Brown testified that stopping the engines would have created a more hazardous situation; and Cowan himself acknowledged that experienced tug captains might reasonably disagree on this issue.

### Conclusion

As discussed above, we conclude that both parties contributed to this allision by violating statutory requirements for safe navigation embodied in the INR and the common law requirements of prudent seamanship. Violation of these rules invokes the Pennsylvania Rule, *supra*, which requires that plaintiff and defendant prove that their respective violations could not have causally contributed to the casualty. At trial, both parties failed to submit such proof. Accordingly, we allocate liability for the damage sustained in this maritime allision, discussed more fully below, according to the degree of the parties' comparative fault. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *see also Valley Towing Service, Inc. v. SS AMERICAN WHEAT*, 618 F.2d 341, 346 (5th Cir.1980).

### *Damages*
### Damage to the CATHERINE

*1. Cost of Repairs and Surveyors Fees*

■ Traditionally, where a damaged vessel is not a total loss, the owner is entitled to recover the reasonable cost of repairs necessary to restore it to its pre-casualty

condition. *Pan–American Petroleum and Transport Co. v. United States*, 27 F.2d 684 (2d Cir.1928); *Tug June S. v. Bordapian (Repairs)*, 418 F.2d 306 (5th Cir.1969); *The B.F. Guinan*, 40 F.2d 277 (E.D.N.Y.1930). In addition, plaintiff is entitled to also recover surveyors fees and all other expenses incurred by the owner related to the repair work. *ANR Production v. MEKHANIK DREN*, 1989 AMC 2299, 1989 WL 180064 (S.D.Tex.1989); *Zanzibar Shipping, S.A. v. Railroad Locomotive Engine*, 533 F.Supp. 392 (S.D.Tex.1982). Plaintiff has the burden of proving the fact of damages suffered, the causation between defendant's acts and those damages, and the amount of damages to a "reasonable certainty." *Pinto v. M/S Fernwood*, 507 F.2d 1327 (1st Cir.1974); *Diesel Tanker Ira S. Bushey, supra*. Collision damages must be proven; courts are not permitted to speculate. *Tanker Hygrade No. 24 v. Dynamic*, 233 F.2d 444 (2d Cir. 1956); *Sinclair Refining Co. v. American Sun*, 188 F.2d 64 (2d Cir.1951). In light of our factual findings *supra* at 1226–1229, we conclude that Turecamo has proven that the October 15, 1991 allision between the CATHERINE and the WEEKS # 516 caused damage to the CATHERINE which required Turecamo to pay the fair and reasonable sum of $84,800 in repairs and associated expenses. Consistent with our apportioning of liability, Turecamo is entitled to two-thirds of this amount from Weeks.

### 2. Lost Profits

■ The owner of a vessel damaged through the fault of another is entitled, over and above the cost of collision repairs, to an award for profits lost during the detention necessary to make the repairs. *Bouchard Transportation Co. Inc. v. The Tug Ocean Prince et al.*, 691 F.2d 609, 612 n. 2 (2d Cir.1982) (citing *Bolivar County Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1308 n. 2 (5th Cir.1978). The measure of detention is "the amount the vessel would have earned in the business in which she has been customarily employed." *Moore–McCormack Lines, Inc. v. The Esso Camden*, 244 F.2d

198, 201 (2d Cir.1957) (citing *Williamson v. Barrett*, 54 U.S. (13 How.) 101, 110, 14 L.Ed. 68 (1851), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 37): *see also Standard Marine Towing Services, Inc. v. M.T. Dua Mar*, 708 F.Supp. 562, 564 (S.D.N.Y.1989).

■ We maintain wide discretion in ascertaining the measure of detention damages. *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170, 176, 53 S.Ct. 103, 105, 77 L.Ed. 240 (1932). Some of the measures most commonly used are: (i) the value of a specific lost charter, *Delta Marine, Drilling Co. v. M/V. Baroid Ranger*, 454 F.2d 128, 129 (5th Cir. 1972); (ii) the earnings of an average voyage, where the ship was run on a fixed route with relatively stable earnings per voyage, *The Potomac*, 105 U.S. (15 Otto) 630, 632, 26 L.Ed. 1194 (1881); (iii) average daily earnings, *The Conqueror*, 166 U.S. 110, 127, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897); *Standard Marine*, 708 F.Supp. at 564; (iv) a demonstrable loss of revenue to the business, *Sinclair Refining Co. v. The American Sun, supra; Bolivar County Gravel Co. v. Thomas Marine Co.*, 585 F.2d 1306, 1307 (5th Cir.1978); (v) the market cost of a substitute with similar characteristics, *The Conqueror*, 166 U.S. 110, 127; *Brooklyn E. Dist. Terminal*, 287 U.S. at 174–75, 53 S.Ct. at 104; and (vi) the comparable earnings of direct competitors, *Oil Screw Noah's Ark v. Bentley & Felton Corp.*, 322 F.2d 3, 8 (5th Cir.1963); *Moore-McCormack Lines, supra*.

■ Here, as indicated *supra* at 1228, Turecamo submitted the testimony of Newman, who, in his estimation of detention damages, relied upon records both of the utilization rate of Turecamo tugs in the same class as the CATHERINE and a profit analysis of the CATHERINE for a period comparable to her time lost due to this casualty. We find that such evidence is sufficient to establish the measure of detention damages under the foregoing authority—demonstrating specifically the "average daily earnings" measure contemplated under *The Conqueror* and *Standard Marine*.[18] Accordingly, again con-

---

**18.** Weeks argues that Turecamo has failed to provide sufficient documentation to establish a measure of lost profits for the CATHERINE. We

note, however, that under the very decision cited by defendant, *Standard Marine*, the court relied upon the testimony of Standard Marine's presi-

sistent with our apportionment of liability, Turecamo is entitled to two-thirds of its claimed damages for lost profits.

### Damage to the WEEKS # 516

In light of the legal authority governing cost of repairs to damaged vessels discussed *supra* at 1228–1229, and our factual findings with respect to liability for the allision, Weeks is entitled to one third of its claimed damages on its counterclaim of $14,260.08.

### Damage to the B–45

#### 1. *Indemnification*

■ In *Anglomar Bulkcarriers, Ltd. v. Maecon S.A., Geneva,* 1982 AMC 1549 (S.D.N.Y.1982), *aff'd,* 685 F.2d 423 (2d Cir. 1982), *cert den.,* 456 U.S. 977, 102 S.Ct. 2243, 72 L.Ed.2d 851 (1982), the court set forth the conditions pursuant to which a vessel owner may obtain indemnity from a tortious party for amounts paid in settlement of a claim:

(a) [P]laintiff has the burden of establishing that there was at least a reasonable likelihood of potential for liability.

(b) [P]laintiff must also show that the settlement was "reasonable."

(c) There must be a timely notice of the suit and the settlement to the defendant.

1982 AMC at 1352–53. We conclude that the foregoing conditions are satisfied in the instant action.

First, at the time that plaintiff settled with Bouchard, in light of the absence of discovery which subsequently took place in this action, Turecamo faced a reasonable likelihood of potential liability for the casualty. Additionally, as discussed *supra* at 1226–1227, Turecamo was able to determine the extent of Bouchard's actual damages due to cost of repairs and common costs (confirmed by the joint survey of the B–45) as well as lost profits (confirmed by the utilization records for the B–65 and B–85 provided to Turecamo by Bouchard shortly after the casualty).

Second, Turecamo settled with Bouchard for $153,482.50, a 92% settlement of Bouchard's claim. We find this settlement to be a fair one in light of the evidence offered at trial concerning Bouchard's damages as a consequence of this casualty.

Finally, it is undisputed that Turecamo notified Weeks on March 4, 1992, several weeks after receiving Bouchard's claim, and informed Weeks that Turecamo intended to hold Weeks liable for all damages and expenses alleged by Bouchard. The letter additionally provided a breakdown of the damage alleged by Bouchard. Accordingly, the *Anglomar* criteria are fulfilled, and Turecamo is entitled to indemnification for its settlement with Bouchard in proportion to its liability as a tortfeasor in this action (i.e., indemnification of ⅔ of the settlement amount).[19]

### Pre–Judgment Interest

■ Pre-judgment interest is awarded in admiralty cases absent special circumstances. *China Union Lines Ltd. v. American Marine Underwriters, Inc.,* 755 F.2d 26 (2d Cir.1985); *Mitsui & Co., Ltd. v. American Export Lines, Inc.,* 636 F.2d 807 (2d Cir. 1981); and *Itel Containers v. Atlanttrafik Exp. Service,* 781 F.Supp. 975 (S.D.N.Y. 1991). We find no such circumstances here.

■ Pre-judgment interest is awarded from the date of the collision up to the date of trial. *Independent Bulk v. Vessel "Morania Abaco,"* 676 F.2d 23 (2d Cir.1982); *Schroeder v. Tug Montauk,* 358 F.2d 485 (2d Cir.1966). The Second Circuit has held that

dent and the earnings records for a comparable period of another year to determine lost profits. Here, Weeks was unable to demonstrate at trial that the profit analyses relied upon by Newman in his testimony on lost profits were inaccurate or otherwise incomparable to the period during which the CATHERINE was out of service. Nor did Weeks show that the tugs for which utilization rates were offered into evidence for this period were not in fact of the same class as the CATHERINE, and thus probative of her utilization rate had she remained in service.

19. Turecamo suggests that, by way of assignment, it is entitled to recover the full amount of Bouchard's damages. *See, e.g., American Commercial Lines Inc. v. Valley Line Co.,* 529 F.2d 921 (8th Cir.1976). We cannot concur. In our view, while the evidence presented at trial sufficed to satisfy the *Anglomar* standard for indemnification, that evidence was neither extensive nor reliable enough to persuade us of the exact measure of Bouchard's damages. Accordingly, we cannot find in favor of Turecamo on the claims to it by Bouchard.

the appropriate measure for calculating pre-judgment interest in admiralty and maritime matters is the average Treasury Bill rate over the previous 12 months. *Ingersoll Milling Machine Company v. M/V Bodena,* 829 F.2d 293 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *see also, Columbia Brick Works, Inc. v. Royal Insurance Company of America,* 768 F.2d 1066 (9th Cir.1985); *Western Pacific Fisheries, Inc. v. S.S. PRESIDENT GRANT,* 730 F.2d 1280 (9th Cir.1984). The Wall Street Journal of June 21, 1994 reflects that the 52 week Treasury Bill rate as of that date was 5.28%

Judgment is to be entered in accordance with this decision.

SO ORDERED.